### In re Denise M. KOLB, Debtor.

### No. 06–32036.

United States Bankruptcy Court, S.D. Ohio, Western Division, at Dayton.

March 30, 2007.

---

Jeffrey P. Albert, Dayton, OH, for Debtor.

## DECISION SUSTAINING CHAPTER 13 TRUSTEE'S OBJECTION TO CONFIRMATION AND DENYING CONFIRMATION OF DEBTOR'S PROPOSED PLAN

LAWRENCE S. WALTER, United States Bankruptcy Judge.

### I. *Background*

On July 28, 2006, the Debtor, Denise M. Kolb, filed her chapter 13 petition (Doc. 1) and proposed chapter 13 plan (Doc. 2). According to her plan, she would contribute $1,660.00 per month, for approximately 36 months, and her unsecured creditors would receive a 10% dividend (Doc. 2). The proposed plan was consistent with the Debtor's schedules I and J, which showed monthly net income of $1,660.00. Monthly net income (*See* Doc. 1—Schedule J) represents, at the time of filing, the Debtor's representation, under oath, of her actual income after subtracting her actual expenses.[1] Under prior law, to ascertain that a debtor was devoting all of her disposable income to the plan, the court's inquiry would be whether a debtor was contributing all her actual income and whether her expenses were reasonably necessary for her and her dependents' support.

However, this case is governed by the Bankruptcy Code as amended by applica-

---

1. The $1,660.00 figure, representing the Debtor's monthly net income in this case, includes the monthly amount to be paid on secured debt and administrative expenses through the plan. In other words, $1,660.00 is what the Debtor intends to pay all of her creditors through the plan and not just her unsecured creditors.

ble provisions of Pub.L. No. 109–8, 119 Stat. 23, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). BAPCPA modified the means by which disposable income is calculated. 11 U.S.C. § 1325(b)(2). With certain exceptions for charitable contributions, child support, disability and foster care payments, a debtor must now exclusively determine her income by employing a new BAPCPA term, "current monthly income" ("CMI"). 11 U.S.C. § 101(10A). As will be detailed, CMI is based on a debtor's average prepetition income for the six months prior to filing, includes certain household contributions to income, and contains limited statutory exclusions. The initial point is only that, regardless of any details in the formula of CMI, it does not reflect a debtor's present income.

Under BAPCPA, once CMI is calculated for an above median family income debtor,[2] such as this Debtor, a debtor's expenses are determined by 11 U.S.C. § 707(b)(2)(A). *See* 11 U.S.C. § 1325(b)(3). Just as CMI does not represent a debtor's actual income, the expenses enumerated in § 707(b)(2)(A) are not derived from a debtor's actual expenses. Instead, the expenses are based, in large part, on predetermined standards, particularly standards "issued by the Internal Revenue Service." 11 U.S.C. § 707(b)(2)(A)(ii)(I). Although the list of available expenses is both detailed and lengthy, the calculation of disposable income for an above median family income debtor is theoretically simple: CMI minus the allowed expenses of § 707(b)(2)(A) equals disposable income. Finally, after those calculations are completed, the court may consider "special circumstances" under the court's limited discretion to adjust either CMI or expenses. 11 U.S.C. § 707(b)(2)(B).

A debtor is required to make the appropriate calculation of her CMI, allowed expenses, and disposable income on Form B22C, a form that must be completed and filed under the new law.[3] In this case, the Debtor's Amended Form B22C (Doc. 16) indicated that the Debtor's CMI is $7,953.00. On an annualized basis, the Debtor's income is above the median family income in the state of Ohio for her household size.[4] After subtracting expenses, the parties agree that the Debtor's disposable income [§ 1325(b)(2) ] is $2,283.76 per month.[5] Thus, although the Debtor's actual monthly net income on her schedules is $1,660.00, her disposable income as derived from the § 1325(b)(2) formula is $2,283.76 per month.

2. "The term 'median family income' means for any year—

(A) the median family income both calculated and reported by the Bureau of the Census in the then most recent year; and

(B) if not so calculated and reported in the then current year, adjusted annually after such most recent year until the next year in which median family income is both calculated and reported by the Bureau of the Census, to reflect the percentage change in the Consumer Price Index for All Urban Consumers during the period of years occurring after such most recent year and before such current year."
11 U.S.C. § 101(39A).

3. All chapter 13 debtors are required to complete Official Form B22C. *See* Interim Bankruptcy Rule 1007(b)(6). In order to provide a practical method to implement these new requirements, the Judicial Conference of the United States prepared, approved, and has subsequently amended Form B22C. Perhaps symbolically or by sheer coincidence, Form B22C resembles a tax form and attempts to track the new statutory requirements of BAPCPA.

4. The Debtor is separated and has three minor children (Docs. 16 and 30).

5. The parties use the figure $1,283.76 in their stipulations, but this is obviously a typographical error (Doc. 30).

Because the Debtor proposes only to pay her actual monthly net income into her plan rather than pay her unsecured creditors the higher disposable income figure, the Chapter 13 Trustee, Jeffrey M. Kellner (the "Trustee"), filed an objection to confirmation of the proposed plan (Doc. 18). Initially, the Trustee argued that the plan was not filed in good faith pursuant to 11 U.S.C. § 1325(a)(3). However, the parties later stipulated that good faith was no longer at issue (Doc. 30). The Trustee instead argues that as an above median family income debtor, the Debtor's disposable income warrants a plan that pays a 100% dividend to unsecured creditors.

This argument is not based on good faith, but, as will be discussed, on a legal interpretation of § 1325(b) and its requirement that, upon an objection to confirmation, a Debtor must submit all of her projected disposable income to the plan. 11 U.S.C. § 1325(b)(1)(B). Although this Bankruptcy Code requirement existed prior to BAPCPA, the new act modifies its meaning with its changes to the calculation of disposable income in § 1325(b)(2). The parties dispute how the modified definition and calculation of "disposable income" affect "projected disposable income" and determination of the amount of each monthly plan payment under § 1325(b)(1)(B).

Additionally, the proposed plan had a term of approximately three years (Doc. 2). The Trustee argues that, under changes enacted in BAPCPA, a five year "applicable commitment period," as defined in § 1325(b)(4), is required. The parties dispute the meaning of "applicable commitment period" and how that term impacts this chapter 13 case.

The parties agreed that the issues in this case could be resolved as a matter of law. *See* Order—Doc. 32. They filed a Joint Stipulation of Facts (Doc. 30), and, pursuant to the court's order, they briefed the applicable legal issues (Docs. 31 and 34).

## II. *Jurisdiction*

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference entered in this District. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L) which concerns plan confirmations.

## III. *Issues and Summary Conclusions*

1) Does the phrase "projected disposable income" in 11 U.S.C. § 1325(b)(1)(B) require a debtor to contribute to her unsecured creditors a different amount than her "disposable income" as calculated in 11 U.S.C. § 1325(b)(2)?

 *Conclusion:* While acknowledging divergent judicial views on this issue, the court determines that "projected disposable income" is simply monthly "disposable income" (based on prepetition "current monthly income") applied to each future month of a chapter 13 plan.

1) How does the term "applicable commitment period," as defined in 11 U.S.C. § 1325(b)(4) and included in 11 U.S.C. § 1325(b)(1)(B), impact the amount that an above median income debtor must pay to unsecured creditors?

 *Conclusion:* For above median income debtors, the "applicable commitment period" is a five-year obligation to pay the debtor's defined disposable income into a chapter 13 plan for the benefit of unsecured creditors unless unsecured creditors would be paid in full in a lesser period of time.

## IV. *Statutory Interpretation Principles*

 Because this analysis requires the court to engage in statutory interpre-

tation of BAPCPA's modifications, modifications that have already been the subject of divergent judicial interpretations, the court begins with a description of the relevant statutory interpretation principles or "tools" it utilizes for that purpose. BAPCPA, by enacting substantial changes, additions and deletions throughout the Bankruptcy Code, has raised challenging issues of statutory interpretation. Early reported decisions suggest that the language used throughout BAPCPA has exacerbated these challenges. *See, e.g., In re Trejos,* 352 B.R. 249, 253–54 (Bankr.D.Nev. 2006) (reviewing various negative comments about the drafting of BAPCPA). Nevertheless, the court's first obligation when interpreting a statute is to apply its plain meaning. As the United States Supreme Court has instructed with regard to the bankruptcy statutes: "We have stated time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (citation omitted). In determining congressional intent, the starting point is always the statutory text. *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 760, 142 L.Ed.2d 881 (1999). It is settled that "when the statute's language is plain, the sole function of the courts-at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 1947, 147 L.Ed.2d 1 (2000) (citations and internal quotes omitted). The Supreme Court has also reminded the bankruptcy courts that it is significant to recognize that "while pre-Code practice 'informs our understanding of the language of the Code,' it cannot overcome that language. It is a tool of construction, not an extratextual supplement." *Id.* at 10, 120 S.Ct. at 1949.

▮▮▮ As cited in *Hartford,* absurdity represents an exception to the doctrine of plain meaning. This doctrine is not an exact tool, but instead a guide to statutory interpretation. *See generally* Karen Cordry, *One Man's Absurdity* ..., 12 Norton Bankr.L. Advisor 1 (Dec.2006); *Cf. In re TCR of Denver, LLC,* 338 B.R. 494 (Bankr. D.Colo.2006) (use of "and" in § 1112(b) is absurd because it would require every factor to exist in order to have cause to dismiss a chapter 11 case); *In re McNabb,* 326 B.R. 785 (Bankr.D.Ariz.2005) (the conclusion that § 522(p), which restricts the homestead exemption, does not apply to opt-out states cannot be considered absurd because it is consistent with prior bankruptcy law). However, absurdity cannot mean that BAPCPA was awkwardly written,[6] does not reach some of the understood goals of BAPCPA,[7] and/or creates unintended consequences,[8] or fails to embrace the same principles as the prior law. In order for the federal courts to exercise their limited role in interpreting federal statutes such as BAPCPA, none of these factors can rise to the level of absurdity. Without attempting to define the outer

---

6. *Lamie v. U.S. Trustee,* 540 U.S. 526, 534, 124 S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004) ("The statute is awkward, and even ungrammatical; but that does not make it ambiguous on the point at issue.").

7. *See In re Sorrell,* 359 B.R. 167, 177 (Bankr. S.D.Ohio 2007) (The court provides examples of how BAPCPA does not, in its specific plain language, always embrace the generally ac-

cepted concept that debtors should provide a greater return to creditors).

8. *See, e.g., Union Bank v. Wolas,* 502 U.S. 151, 158, 112 S.Ct. 527, 531, 116 L.Ed.2d 514 (1991) ("The fact that Congress may not have foreseen all the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning."; citation omitted).

limits of absurdity, the court simply concludes that it must be something more than a subjectively flawed statute.[9]

▆ Finally, the court notes that, leaving aside the theoretical conflict on the use of legislative history in statutory interpretation, legislative history typically is of very limited practical help in interpreting BAPCPA. The act lacks a conference committee report or an analogous floor manager report that might better represent the viewpoint of the entire Congress. *In re Sorrell,* 359 B.R. 167, 175 (Bankr. S.D.Ohio 2007). The frequently cited House Judiciary Report adds little useful analysis to explain most of BAPCPA's provisions. *Id.* at 175 ("Even assuming it is appropriate to consider the House Judiciary Report (which represents only a view of members of one committee of one house of the federal bicameral legislature) as a source of legislative history, it often contains a mere recitation of the eventually enacted statutory text and adds little, if any, assistance to the court's efforts in determining Congress's intent. *See* H.R. Rep. 109–31(I), 2005 U.S.C.C.A.N. 88").

Keeping these principles in mind, the court considered the issues in this case.

## V. *Analysis*

The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPC-PA") fundamentally changed many aspects of chapter 7 and chapter 13 practice. The dispute in this case concerns the meaning of certain chapter 13 statutory provisions, as modified by BAPCPA, that govern plan confirmation. More specifically, the parties dispute the meaning of the phrases "projected disposable income" as used in 11 U.S.C. § 1325(b)(1)(B) and "applicable commitment period" described in 11 U.S.C. § 1325(b)(1)(B) and (b)(4). These two concepts significantly impact the amount of a debtor's monthly plan payment as well as the required duration of a debtor's chapter 13 plan.

The court begins with its examination of the meaning of "projected disposable income," a phrase that existed prior to BAPCPA, but was modified by BAPCPA's changes to the calculation of "disposable income" in 11 U.S.C. § 1325(b)(2). To fully comprehend the import of this modification and its impact on plan payment calculations when a party objects to confirmation, it is important to consider it in context by beginning with how plan payments were determined prior to BAPC-PA's enactment.

### A. Calculating "Disposable Income" and "Projected Disposable Income" Prior to BAPCPA

Prior to BAPCPA, the process for determining how much a debtor needed to contribute to a chapter 13 plan was relatively

---

**9.** As stated by the United States Supreme Court:

It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think, perhaps along with some Members of Congress, is the preferred result. *See Smith v. United States,* 508 U.S. 223, 247, n. 4, 113 S.Ct. 2050, 2063, 124 L.Ed.2d 138 (1993) (SCALIA, J., dissenting) ("Stretching language in order to write a more effective statute than Congress devised is not an exercise we should indulge in"); *Pavelic & LeFlore v. Marvel Entertainment Group, Div. of Ca-*

*dence Industries Corp.,* 493 U.S. 120, 126, 110 S.Ct. 456, 460, 107 L.Ed.2d 438 (1989) ("Our task is to apply the text, not to improve upon it[.]").

*U.S. v. Granderson,* 511 U.S. 39, 68–69, 114 S.Ct. 1259, 1275, 127 L.Ed.2d 611 (1994) (Kennedy, J., concurring); *See also In re Hanks,* 362 B.R. 494, 502 (Bankr.D.Utah 2007) ("Ultimately, it is not within this Court's power nor is it this Court's role to change Congress' intentional policy choices or to save it from its inadvertent drafting errors."; footnote omitted).

straightforward. Although confirmation of a chapter 13 plan had, and continues to have, many requirements [10], arguably the most fundamental of those was that, upon objection by a "holder of an unsecured claim" or the chapter 13 Trustee, a debtor was required to submit all "projected disposable income" to fund a chapter 13 plan. *See* 11 U.S.C. § 1325(b)(1)(B), prior to BAPCPA. "Projected disposable income" was not a defined term in the Bankruptcy Code but "disposable income" was defined as income "received by the debtor . . . less amounts reasonably necessary to be expended—(A) for the maintenance or support of the debtor or a dependent of the debtor. . . ." 11 U.S.C. § 1325(b)(2)(A), prior to BAPCPA.[11]

If an objection was filed, the court would evaluate the actual income and expenses of a debtor to determine if the budget was reasonable. This evaluation occurred regardless of the income of the debtor. "Disposable income," as defined in § 1325(b)(2), was typically applied directly as "projected disposable income" over the term of a chapter 13 plan pursuant to § 1325(b)(1)(B). *See Anderson v. Satterlee (In re Anderson)*, 21 F.3d 355, 357 (9th Cir.1994); *In re Brady*, 361 B.R. 765, 771 (Bankr.D.N.J. 2007) ("In this regard, the phrase 'projected disposable income', did not change as a result of the BAPCPA amendments.").

**B. Calculating Income, Expenses and Disposable Income for a Chapter 13 Debtor Under BAPCPA**

Among other significant changes to chapter 13 created by BAPCPA, the defi-

nition of "disposable income" was amended to read as follows:

(b)(2) For purposes of this subsection, "disposable income" means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended—

(A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and

(ii) for charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2). Income is no longer based on "income received by the debtor," but instead is based on the debtor's "current monthly income" (CMI). *Id.* This new term is defined in 11 U.S.C. § 101(10A):

---

**10.** *See generally* §§ 1322 (Contents of Plan) and 1325 (Confirmation of Plan). The other fundamental requirement for chapter 13 confirmation is found at § 1325(a)(4), which is unchanged by BAPCPA. Section 1325(a)(4), commonly referred to as the "best interest" or "liquidation" test, ensures that unsecured creditors receive as least as much as they would in a chapter 7 case.

**11.** Section 1325(b)(2)(B) provided the inclusion of the disposable income of a chapter 13 debtor engaged in business. It is unchanged by BAPCPA.

(10A) The term "current monthly income"—

(A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on—

(i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or

(ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and

(B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but excludes benefits received under the Social Security Act, payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes, and payments to victims of international terrorism (as defined in section 2331 of title 18) or domestic terrorism (as defined in section 2331 of title 18) on account of their status as victims of such terrorism.

The salient characteristic of CMI is that it is derived from an average of the debtor's income over the six months prior to the bankruptcy filing. The statute also requires "any amount paid" by anyone other than a debtor "on a regular basis for the household expenses" to be included in the calculation of CMI. 11 U.S.C. § 101(10A)(B). As noted in a number of reported decisions, a debtor's actual income may be better or worse, often considerably so, than what is reflected in her CMI. *See, e.g., In re Fuller,* 346 B.R. 472, 483 (Bankr.S.D.Ill.2006). For example, if the debtor lost a high paying job shortly before filing bankruptcy and is planning to fund the plan with a lower paying job, her CMI could be higher than her actual income. Conversely, if a debtor received a raise or found a higher paying job shortly before filing, a debtor's actual income could be higher than her CMI. Also, § 101(10A) excludes certain income from CMI such as "benefits received under the Social Security Act." *See, e.g., Sorrell,* 359 B.R. at 179–183 (holding that unemployment compensation is one of the "benefits received under the Social Security Act"). Although it is true that CMI does not reflect a debtor's actual income at the time of the bankruptcy filing, it represents, by the definition's plain language, the policy judgment of Congress of how income should be determined in the context of chapter 13 after BAPCPA.[12]

Once a debtor has determined her CMI, a debtor must subtract her expenses to determine disposable income. For debtors below the median income of their state

**12.** Although it has been correctly noted, borrowing from history's judgment of the Holy Roman Empire, that CMI is not current, not really monthly, or necessarily income, Congress felt this was how income should be determined. *See* Keith Lundin, *Chapter 13 Bankruptcy 3d Ed.,* § 468.1, p. 468-2–468-5 (Supp.2006). *But see Fuller,* 346 B.R. at 485 (Schedule I, as the actual income of a debtor, should be used to determine income); *But see also In re Pak,* 357 B.R. 549, 552 (Bankr. N.D.Cal.2006) ("In determining whether a plan provides all of the debtor's 'projected disposable income,' a court should attempt to predict what the debtor's disposable income during the term of the plan will be, using the definition of 'current monthly income' set forth in 11 U.S.C. § 101(10A).").

(based on their household size), expenses are still determined based on the familiar "reasonably necessary" test that applied prior to BAPCPA. 11 U.S.C. § 1325(b)(2) and (b)(3). However, for above median family income debtors, § 1325(b)(3) [13] requires that expenses are to be determined with reference to 11 U.S.C. § 707(b)(2)(A). [14] *In re Farrar–Johnson*, 353 B.R. 224, 228 (Bankr.N.D.Ill.2006); *In*

13. 11 U.S.C. § 1325(b)(3) states that:

Amounts reasonably necessary to be expended under paragraph (2), other than subparagraph (A)(ii) of paragraph (2), shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if the debtor has current monthly income, when multiplied by 12, greater than—

(A) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;

(B) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

(C) in the case of a debtor in a household exceeding 4 individuals, the highest median family income of the applicable State for a family of 4 or fewer individuals, plus $525 per month for each individual in excess of 4.

Since the filing of this case, the statute was amended pursuant to the Religious Liberty and Charitable Donation Clarification Act of 2006 to allow charitable deductions for above median income debtors. The amendment became law on December 20, 2006 as Pub.L. 109–439, 120 Stat. 3285. Although such donations are not at issue in this case, the court notes it is quoting the statute as it reads as of the date of this decision.

14. Section 707(b)(2)(A) states:

(2)(A)(i) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of—

(I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,000, whichever is greater; or

(II) $10,000.

(ii)(I) The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief, for the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case, if the spouse is not otherwise a dependent. Such expenses shall include reasonably necessary health insurance, disability insurance, and health savings account expenses for the debtor, the spouse of the debtor, or the dependents of the debtor. Notwithstanding any other provision of this clause, the monthly expenses of the debtor shall not include any payments for debts. In addition, the debtor's monthly expenses shall include the debtor's reasonably necessary expenses incurred to maintain the safety of the debtor and the family of the debtor from family violence as identified under section 309 of the Family Violence Prevention and Services Act, or other applicable Federal law. The expenses included in the debtor's monthly expenses described in the preceding sentence shall be kept confidential by the court. In addition, if it is demonstrated that it is reasonable and necessary, the debtor's monthly expenses may also include an additional allowance for food and clothing of up to 5 percent of the food and clothing categories as specified by the National Standards issued by the Internal Revenue Service.

(II) In addition, the debtor's monthly expenses may include, if applicable, the continuation of actual expenses paid by the debtor that are reasonable and necessary for care and support of an elderly, chronically ill, or disabled household member or member of the debtor's immediate family (including parents, grandparents, siblings, children, and grandchildren of the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case who is not a dependent) and who is unable to pay for such reasonable and necessary expenses.

(III) In addition, for a debtor eligible for chapter 13, the debtor's monthly expenses may include the actual administrative expenses of administering a chapter 13 plan for the district in which the debtor resides, up to an amount of 10

*re Guzman,* 345 B.R. 640, 646 (Bankr. E.D.Wis.2006). Finally, because Congress specifically referenced subparagraph (B) of § 707(b)(2) in § 1325(b)(3), § 707(b)(2)(B) may allow for an adjustment to CMI or a debtor's expenses where "special circumstances" exist. *In re Hanks,* 362 B.R. 494, 500 (Bankr.D.Utah 2007).

Section 707(b)(2) is commonly referred to in BAPCPA parlance as the "means test." Despite its inclusion in chapter 7 of Title 11, it now significantly impacts both chapters 7 and 13. In chapter 7, the "means test" determines when a case is presumed to constitute an abuse and, therefore, presumptively should be dismissed (or, at the debtor's option, converted to chapters 13 or 11). *Sorrell,* 359 B.R. at 178–80. In chapter 13, it is used to determine an above median family income debtor's expenses and, ultimately, by subtracting those expenses from CMI, a debtor's disposable income available to pay general unsecured creditors.

Section 707(b)(2), consistent with the formulaic approach used to calculate income for debtors, reflects the intent of Congress to provide less discretion in the determination of expenses for above median family income debtors. While interpretive conflicts have arisen as to the application of statutory language to specific expenses, it is apparent that, for above median family income debtors, Congress intended the determination of expenses in § 707(b)(2)(A) to apply in calculating disposable income under § 1325(b)(2). The statutory language selected by the drafters indicates that Congress deliberately preferred these defined immutable expenses for above family median income debtors as opposed to their actual reasonable and necessary expenses verified under oath. Where Congress wanted to provide any discretion, the statutory language provides for this discretion explicitly, unambiguously, and with defined conditions.[15]

percent of the projected plan payments, as determined under schedules issued by the Executive Office for United States Trustees.

(IV) In addition, the debtor's monthly expenses may include the actual expenses for each dependent child less than 18 years of age, not to exceed $1,500 per year per child, to attend a private or public elementary or secondary school if the debtor provides documentation of such expenses and a detailed explanation of why such expenses are reasonable and necessary, and why such expenses are not already accounted for in the National Standards, Local Standards, or Other Necessary Expenses referred to in subclause (I).

(V) In addition, the debtor's monthly expenses may include an allowance for housing and utilities, in excess of the allowance specified by the Local Standards for housing and utilities issued by the Internal Revenue Service, based on the actual expenses for home energy costs if the debtor provides documentation of such actual expenses and demonstrates that such actual expenses are reasonable and necessary.

(iii) The debtor's average monthly payments on account of secured debts shall be calculated as the sum of—

(I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and

(II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts; divided by 60.

(iv) The debtor's expenses for payment of all priority claims (including priority child support and alimony claims) shall be calculated as the total amount of debts entitled to priority, divided by 60.

**15.** *See, e.g.,* 11 U.S.C. § 707(b)(2)(A)(ii)(I) ("In addition, if it is demonstrated that it is reasonable and necessary, the debtor's monthly expenses may also include an additional al-

**C. Although Divergent Approaches Exist, the Court Concludes that the Language and Structure of § 1325(b) Compels Reading "Projected Disposable Income" as Monthly "Disposable Income" (Based on CMI) Applied to Each Future Month of the Chapter 13 Plan**

The Debtor adhered to the formulas mandated by BAPCPA by completing Form B22C thereby calculating CMI less allowed expense deductions to arrive at the Debtor's monthly disposable income under § 1325(b)(2). The parties agree that $2,283.76, as shown on line 58 of the Debtor's Amended Form B22C (Doc. 16),[16] was correctly computed. However, the parties' dispute concerns how this disposable income of the Debtor is ultimately applied to the Debtor's plan as *projected* disposable income. *See* 11 U.S.C. § 1325(b)(1)(B).

The Trustee argues that the phrase "projected disposable income" in § 1325(b)(1)(B) requires a debtor to project her disposable income, as calculated in § 707(b) and Amended Form B22C, over the life of the plan. Under this view, the word "project" simply means to apply the calculated monthly disposable income to each future month within the term of the plan. In other words, the Debtor's disposable income calculation is a fixed formula for determining plan payment amount and does not allow for consideration of a Debtor's actual income and expenses as listed on Schedules I and J. Consequently, the Trustee asserts that the Debtor is re-

quired to pay unsecured creditors $2,283.76 each month over the life of the plan or until unsecured creditors are paid a 100% dividend on their claims.

Although the Debtor concedes that BAPCPA now defines "disposable income" using the rigid formula in § 1325(b)(2) and § 707(b), she argues that required plan payments are not to be determined by simple mathematical extrapolation of disposable income. Instead, she views the phrase "projected disposable income" in § 1325(b)(1)(B) as a distinct and more flexible concept. By modifying "disposable income" with the word "projected," the Debtor argues, Congress intended that courts consider a debtor's future projected income beyond the backward-looking calculation on Amended Form B22C. The Debtor asserts that, if Schedules I and J more accurately reflect a debtor's future income over the life of the plan, the net monthly income amount set forth on those schedules should be used to determine her required plan payments, not the rigid and unrealistic disposable income calculation espoused by the Trustee. Consequently, the Debtor requests that the court confirm her plan based upon her net monthly income of $1,660.00 derived from her Schedules I and J.

Unfortunately, as with many aspects of BAPCPA, the language of the statute is less than crystal clear leading to divergent case law adopting a variety of approaches to determining the meaning of the phrase "projected disposable income," including

lowance for food and clothing of up to 5 percent of the food and clothing categories as specified by the National Standards issued by the Internal Revenue Service."); 11 U.S.C. § 707(b)(2)(A)(ii)(IV) ("In addition, the Debtor's monthly expenses may include the actual expenses for each dependent child less than 18 years of age, not to exceed $1,500 per year per child, to attend a private or public elementary or secondary school if the debtor

provides documentation of such expenses and a detailed explanation of why such expenses are reasonable and necessary, and why such expenses are not already accounted for in the National Standards, Local Standards, or Other Necessary Expenses referred to in subclause (I)").

**16.** Line 58 is titled "Monthly Disposable Income Under § 1325(b)(2)."

both approaches espoused by the parties. *See Brady,* 361 B.R. at 770 (providing an excellent overview of the case law and the divergent approaches adopted therein). The court also recognizes that the approach adopted by the Trustee can lead to harsh and, sometimes, unfair results for debtors whose actual net monthly income is less than what they are required to pay using the rigid disposable income calculation on Amended Form B22C. Nonetheless, after reviewing the language of § 1325 and employing statutory tools of construction, the court concludes that this formulaic calculation of "disposable income" as defined in § 1325(b)(2) was what Congress intended courts to employ when determining "projected disposable income" and the required plan payment amount in § 1325(b)(1)(B).

The court begins with the language of 11 U.S.C. § 1325(b)(1)(B) that applies when a trustee or creditor objects to confirmation of a debtor's chapter 13 plan:

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A). . . .

(B) the plan provides that *all of the debtor's projected disposable income to be received* in the applicable commitment period beginning on the date that the first payment is due under the plan *will be applied to make pay-*

*ments to unsecured creditors under the plan.* (emphasis added).

Section 1325(b)(1)(B) contains the word "projected," but the word does not appear in § 1325(b)(2), the section that defines "disposable income" in a dramatically new way under BAPCPA. Some decisions, noting this discrepancy, have held that "projected disposable income" must be given independent meaning from the defined term "disposable income." *See e.g., In re Kibbe,* 361 B.R. 302, 312 (B.A.P. 1st Cir. 2007); *In re Casey,* 356 B.R. 519, 522–23 (Bankr.E.D.Wash.2006); *In re Jass,* 340 B.R. 411, 415–16 (Bankr.D.Utah 2006); *In re Hardacre,* 338 B.R. 718, 722 (Bankr. N.D.Tex.2006). In some instances, the courts construe "projected disposable income" as a separate term and in others they view the word "projected" as a modifier of the term "disposable income," but regardless of their particular construction, all of these cases ultimately hold that the strictly defined term "disposable income" in § 1325(b)(2) can be more flexibly applied in § 1325(b)(1)(B). These cases emphasize that the word "projected" in § 1325(b)(1)(B) cannot be superfluous to the statute and, therefore, it is improper to equate "disposable income" in § 1325(b)(2) with "projected disposable income" in § 1325(b)(1)(B). *Kibbe,* 361 B.R. at 312. Furthermore, they assert that because the plain meaning dictionary definition [17] of the word "projected" is "forward-looking," it must refer, at least to some extent, to a

---

17. *See, e.g., Casey,* 356 B.R. at 522 ("The word 'projected' means to plan, figure, or estimate for the future. *Webster's II College Dictionary* 884 (1995)."); *Jass,* 340 B.R. at 415–16 ("The word 'projected' means '[t]o calculate, estimate, or predict (something in the future), based on present data or trends.' *The Am. Heritage College Dictionary* 1115 (4th ed.2002)."). While it is hard to quibble with the premise that "projected" is "future-oriented," it is less clear why these simple definitions would compel a more complex compu-

tation than multiplying monthly disposable income (as formulaically determined under the § 1325(b)(2) definition) times the number of months in the plan. To "figure" or "calculate" would certainly encompass multiplication or a variety of other mathematical endeavors. Furthermore, applying historical data such as CMI to future months is no less "future-oriented" than applying the more recent income and expenses from a debtor's schedules.

debtor's actual income and expenses into the future. *Kibbe,* at 309 (agreeing with the lower bankruptcy court that "projected disposable income" is a forward-looking concept that must be grounded in a debtor's anticipated income during the life of the plan); *In re Grady,* 343 B.R. 747, 750–51 (Bankr.N.D.Ga.2006); *Jass,* 340 B.R. at 415–16. According to this view, because Congress created a "backward-looking" concept for "disposable income," "projected disposable income" must mean something else entirely.

Once they reject using the rigid disposable income formula in § 1325(b)(2) as the exclusive method for determining the payment to unsecured creditors, these courts are left with creating a different method for determining such payments, one not clearly provided for in the statute. At this point, the uniformity among courts adopting this approach ends.

To give some meaning to the defined term "disposable income" in § 1325(b)(2), some of these courts require that debtors at least begin with the disposable income calculation on Form B22C. *See Jass,* 340 B.R. at 415–16. These courts refer to the disposable income calculation as a "starting point," "estimate," "presumption" or "guide," but do not always provide clear guidance as to what situations allow the debtor to deviate from that starting calculation or what formula the debtor should use to adjust it. *See Grady,* 343 B.R. at 751 (noting that the CMI figure is useful as an "estimate," but that a court should evaluate a debtor's past and current financial status to determine disposable income); *Jass,* 340 B.R. at 415–16 (noting that the debtor must start with the disposable income formula but may deviate if it "does not adequately represent the debtor's budget into the future"). Other courts appear to disregard § 1325(b)(2)'s definition of "disposable income" in its entirety and allow debtors to, instead, resort to

their schedules to determine plan payments. *In re Edmunds,* 350 B.R. 636, 647 & 649 (Bankr.D.S.C.2006) (allowing the court to consider actual income and expenses on schedules I and J as well as any other evidence during confirmation); *In re Demonica,* 345 B.R. 895, 900 (Bankr. N.D.Ill.2006). Another court has adopted a mixture of the disposable income formula and schedules in order to arrive at a calculation for plan payment determination. *In re Upton,* 363 B.R. 528, 532 (Bankr. S.D.Ohio 2007) (using schedules I and J to determine projected disposable income, but subtracting from that calculation certain income specifically excluded from the calculation of current monthly income in § 101(10A)).

This court respectfully disagrees with the reasoning in this line of cases. Treating "projected disposable income" as a stand-alone term or concept with a separate meaning from the defined term "disposable income" conflicts with the language and structure of § 1325(b). Significantly, Congress decided to place the definition of "disposable income" within the same subsection of § 1325 that requires a debtor, upon objection to confirmation, to pay all of his "projected disposable income" into the plan:

> (b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—
>
> . . . .
>
> (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

(2) For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor....

11 U.S.C.A. § 1325(b). Thus, after noting, in § 1325(b)(1), that projected disposable income is to be used to determine a debtor's plan payments upon an objection, Congress states in § 1325(b)(2) that "[f]or purposes of this subsection, the term 'disposable income' means current monthly income received by the debtor...." 11 U.S.C. § 1325(b)(2).[18] This language is quite clear and its placement in the same subsection makes its direct application to "projected disposable income" emphatic and unmistakable. If "projected disposable income" is given a separate and independent meaning from "disposable income," it would appear that the defined term "disposable income" has no purpose within the subsection whatsoever. *See In re Alexander*, 344 B.R. 742, 749 (Bankr. E.D.N.C.2006) ("If 'disposable income' is not linked to 'projected disposable income' then it is just a floating definition with no apparent purpose."). Consequently, the word "projected" cannot modify the definition of "disposable income" in the dramatic fashion some courts have suggested without rendering the definition meaningless and irrelevant.

This court does not agree that the word "projected" has such a transforming impact. Nor does this court agree that failure to construe the word "projected" in that manner necessarily makes the word superfluous. That the drafters retained the word "projected" in § 1325(b)(1)(B) makes logical grammatical sense in the context of that particular subsection. It is true that the sentence could be grammatically completed without the word "projected," but the word is an acknowledgement that the disposable income that has been calculated to be received by unsecured creditors based on a single month, must be extended or projected over a series of months during the life of a chapter 13 plan.[19] *See Brady*, 361 B.R. at 772 ("The simple and direct meaning of the phrase ... is that the debtor's disposable income, as calculated under the statute, which is projected to be received over the course of the applicable commitment period, must be

---

**18.** It may or may not be significant that Congress apparently did not distinguish between "disposable income" and "projected disposable income" in 11 U.S.C. § 1129(a)(15)(B) where it refers to "projected disposable income ... as defined in section 1325(b)(2)...." Of course, as every reported decision on this legal issue has noted, § 1325(b)(2) speaks of "disposable income" and not "projected disposable income." Although this court does not suggest what weight this comparison should be given, and the language might be considered a simple scrivener error, § 1129(a)(15)(B) certainly suggests that "disposable income" in § 1325(b)(2) and "projected disposable income" in § 1325(b)(1)(B) were regarded by Congress as the same concept.

**19.** It has also been argued that the phrase "to be received" in § 1325(b)(1)(B) further supports the contention that Congress intended

to refer to the actual future income to be received by the debtor during the applicable commitment period, rather than prepetition average income. *See Hardacre*, 338 B.R. at 723. However, the fact that the phrase is "forward-looking" is not inconsistent with the court's analysis. The phrase simply refers to the payments that will be received throughout the life of the plan. Regardless of how the amount to be paid creditors is determined, general unsecured creditors with allowed claims will receive the funds, not at the time of filing or at confirmation, but in the future. At worst, the phrase could be viewed as figurative, a loose and inartful expression that the current monthly income belongs to or is attributable to the debtor. Even so, the language is insufficiently strong and clear to allow this court to ignore the defined term "current monthly income" created by BAPCPA in favor of the concept it replaced.

dedicated to the payment of the unsecured creditors.").

That Congress has chosen a different calculation for determining disposable income to be projected does not make the superfluous word argument any more compelling than it would have been before BAPCPA.[20] *See Hanks*, 362 B.R. at 498 (noting that Congress simply chose a different method of projecting a return to unsecured creditors). As noted, BAPCPA considers past income and defined expenses, with some defined adjustments, to determine what an above median family income chapter 13 debtor must pay into his plan for unsecured creditors.[21] *Alexander*, 344 B.R. at 749 ("The court finds that, in order to arrive at 'projected disposable income,' one simply takes the calculation mandated by § 1325(b)(2) and does the math."); *In re Girodes*, 350 B.R. 31, 36 (Bankr.M.D.N.C.2006) (similar).

It is undeniably true that "disposable income" looks at a debtor's past income in calculating CMI. Congress apparently determined that basing future payment obligations on a past income average was the exclusive way to "project" a debtor's financial situation into the future, rather than relying on the income and expenses listed on a debtor's schedules. It may be that Congress did not trust debtors to provide current information or may have decided that past income, over a six month period, was simply more accurate. Congress may have wanted formulaic certainty over judicial discretion, particularly for above median family income debtors. Regardless of the reason(s), the plain meaning of §§ 1325(b)(2) and 1325(b)(1)(B) demands recourse to prepetition income (as adjusted by the calculation of CMI), minus the allowed expenses of § 707(b)(2)(A), as the best estimate for a debtor's future income

**20.** The phrase "projected disposable income" in § 1325(b)(1)(B) existed prior to the enactment of BAPCPA. Despite this fact, the distinction between "disposable income" and "projected disposable income" was not a significant issue of statutory interpretation prior to BAPCPA. One pre-BAPCPA case sometimes cited as making a distinction between "disposable income" and "projected disposable income" is *Anderson v. Satterlee (In re Anderson)*, 21 F.3d 355 (9th Cir.1994). *See, e.g., Jass*, 340 B.R. at 417, n. 18. Although it is true that the *Anderson* case makes such a distinction, it does not support the view that disposable income is a base amount subject to modification upon projection. In describing the process of determining "projected disposable income" over three years, the court stated that '[f]or practical purposes, this task is usually accomplished by multiplying the debtor's monthly income by 36. Next, the bankruptcy court must assess the amount of the debtor's income that is "disposable." ' *Anderson*, 21 F.3d at 357 (quoting *Matter of Killough*, 900 F.2d 61, 64 (5th Cir.1990)).

**21.** In addition, § 707(b)(2)(B) pertaining to "special circumstances" is the method, albeit greatly circumscribed, by which to modify income and expenses at confirmation. *See*

generally, *In re Sparks*, 360 B.R. 224, 230 (Bankr.E.D.Tex. 2006). To the extent issues such as overtime or future raises may have been appropriately considered separately as projected disposable income prior to BAPCPA, income is now defined by CMI. *See* Keith Lundin, Chapter 13 Bankruptcy 3d Ed., § 164.1, p. 164–32–164–38 (2000) (discussion of projected disposable income prior to BAPCPA). Because § 1325(b)(3) specifically refers to § 707(b)(2)(B), this court believes that consideration of any other "change of circumstances" at the time of confirmation is precluded. *See In re Tranmer*, 355 B.R. 234, 250 (Bankr.D.Mont.2006) (Section 707(b)(2)(B) does not justify a "parallel analysis" which adjusts the calculations of §§ 1325(b)(2) and 1325(b)(1)(B) for a "substantial change in circumstances."). *But see Jass*, 340 B.R. at 418 (disposable income can be adjusted at confirmation based on a substantial change in circumstances). In this case, the Debtor did not raise any issue of "special circumstances" under § 707(b)(2)(B) and the court is left with no statutory basis for adjusting the calculation of disposable income for her plan payments. It must also be noted that the timing and nature of postpetition plan modifications will likely be impacted by the court's interpretation of § 1325(b).

and expenses. While the wisdom of this concept has been hotly debated, this is the path Congress chose for chapter 13. Moreover, this method does not rise to the level of absurdity—a limited exception to the general overriding rule of plain meaning.

In its final analysis, the court concludes that the phrase "projected disposable income" has the same meaning today as it did before the enactment of BAPCPA. *Brady,* 361 B.R. at 771. Congress simply decided upon a new way to calculate disposable income before projecting that figure into the plan. *See id.* (determining that the "term 'projected' requires the court to 'project' forward the debtors' disposable income, as now defined under the revised Code, to determine the requisite payments to unsecured creditors under the plan"); *Hanks,* 362 B.R. at 499 ("In 'projecting' a return to general unsecured creditors under the BAPCPA for above-median income debtors, this Court's view is that its new function is solely to multiply the net 'disposable income' figure ... by the applicable commitment period. No more, no less.").

### D. Applicable Commitment Period

■ After determining the Debtor's disposable income, the court must next calculate the return to be paid to unsecured creditors over the life of the plan. This calculation requires the court to analyze the impact of another term added to the Bankruptcy Code by BAPCPA, "applicable commitment period." As revised by Congress, § 1325(b)(1)(B) now states:

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) . . . .

(B) the plan provides that all of the debtor's projected disposable income

to be received in the [three year period] *applicable commitment period* beginning on the date that the first payment is due under the plan will be applied to make payments *to unsecured creditors* under the plan.

11 U.S.C. § 1325(b)(1)(B) (BAPCPA additions italicized and deletions in brackets). Pursuant to this section, if an objection to confirmation is filed by the trustee or an unsecured creditor, a debtor must submit to the plan all of his or her projected disposable income for the applicable commitment period. The term "applicable commitment period" is defined in § 1325(b)(4) in the following manner:

(4) For purposes of this subsection, the "applicable commitment period"—

(A) subject to subparagraph (B), shall be—

(i) 3 years; or

(ii) not less than 5 years, if the current monthly income of the debtor and the debtor's spouse combined, when multiplied by 12, is not less than—

(I) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;

(II) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

(III) in the case of a debtor in a household exceeding 4 individuals, the highest median family income of the applicable State for a family of 4 or fewer individuals, plus $525 per month for each individual in excess of 4; and

(B) may be less than 3 or 5 years, whichever is applicable under subparagraph (A), but only if the plan pro-

vides for payment in full of all allowed unsecured claims over a shorter period.

11 U.S.C. § 1325(b)(4). The definition is fairly straightforward and, in the instant case, the court need not resolve the interpretive conflicts pertaining to its application in § 1325(b)(1)(B).[22] "Simply put, the applicable commitment period under § 1325(b)(4) for a below median income debtor is three years, and for an above median income debtor is five years, but may be shorter for either if the plan provides for payment in full of unsecured claims over a shorter period." *In re Davis*, 348 B.R. 449, 453 (Bankr.E.D.Mich. 2006).

In this case, the Debtor has proposed a three year plan paying unsecured creditors a ten percent (10%) return on their claims. However, as noted previously, the Debtor's current monthly income is above the medi-

---

22. Currently, bankruptcy courts across the nation are wrestling with the precise nature of the term "applicable commitment period" and whether it represents a multiplier as well as a temporal length of time that a debtor must remain in a chapter 13 plan or is instead only a multiplier to be used to calculate the total amount of disposable income (the "pot") that must be submitted by a debtor over the life of a plan. The controversy appears to arise in one of two situations in which a debtor attempts to exit his chapter 13 plan earlier than the applicable commitment period would appear to allow without paying unsecured creditors in full. The first situation is a result of the new formula calculating disposable income that leaves some fortunate debtors with excess funds each month that they are no longer required to submit to a chapter 13 plan. Some of these debtors have proposed early "cash out" plans requesting to use the excess funds to pay unsecured creditors their required return, something less than payment in full, over a shorter period of time than the applicable commitment period. *See, e.g., In re Slusher*, 359 B.R. 290 (Bankr. D.Nev. 2007); *Casey*, 356 B.R. 519; *In re Zirtzman*, 2006 WL 3000103 (Bankr.N.D.Iowa Oct.4, 2006); *In re Cushman*, 350 B.R. 207 (Bankr.D.S.C.2006); *Girodes*, 350 B.R. 31; *In re Davis*, 348 B.R. 449 (Bankr.E.D.Mich. 2006); *In re Fuger*, 347 B.R. 94 (Bankr. D.Utah 2006); *In re McGuire*, 342 B.R. 608 (Bankr.W.D.Mo.2006). With respect to the "cash out" situation, a few courts have suggested that it makes little sense for a trustee or unsecured creditor to object to confirmation in order to hold a debtor hostage for the full applicable commitment period; unsecured creditors will receive the same monetary return either way and most creditors would prefer to receive their return sooner rather than later. *Zirtzman*, 2006 WL 3000103, at *3; *Fuger*, 347 B.R. at 101. *See also Miller v. Lone Star Mortgage, Inc. (In re Miller)*, 325 B.R. 539, 542 (Bankr.W.D.Pa. 2005) (pre-BAPCPA case recognizing that a voluntary early payoff by a debtor using refinancing to accomplish it hurts no one and actually increases the economic worth or present value of the distribution to unsecured creditors).

The other situation in which the dispute over the meaning of "applicable commitment period" arises is in zero percent plans—i.e. plans in which the debtors have no disposable income leftover each month to pay general unsecured creditors resulting in no return on these creditors' claims. Several courts have concluded that the term "applicable commitment period" as used in § 1325(b)(1)(B) does not apply to debtors with nó disposable income. *See, e.g., Brady*, 361 B.R. at 777; *In re Lawson*, 361 B.R. 215, 219 (Bankr.D.Utah 2007); *Alexander*, 344 B.R. at 751. Furthermore, there is arguably no reason for a debtor with no monthly disposable income to remain in his chapter 13 case any longer than necessary to repair his secured debt and pay his priority creditors since general unsecured creditors will receive nothing regardless of how long the plan runs. *Lawson*, 361 B.R. at 219; *Alexander*, 344 B.R. at 751 (noting that there is "no reason to extend plans artificially if there is no requirement of a dividend to be paid to unsecured creditors over time").

Based on her disposable income calculation, the Debtor in this particular case must pay her unsecured creditors in full so neither the early cash out nor the zero percent plan scenarios apply. As such, the issue of whether the applicable commitment period is temporal and/or a multiplier is not a matter that must be determined in this case. The issue will remain for another day.

an family income for a household of four in the state of Ohio. Consequently, pursuant to the clear language of § 1325(b)(4), the applicable commitment period for this Debtor is five years or 60 months. In other words, because an objection to confirmation has been filed by the Trustee pursuant to 11 U.S.C. § 1325(b)(1)(B), the Debtor must pay unsecured creditors her monthly disposable income of $2,283.76 for a period of 60 months resulting in a dividend to unsecured creditors over the life of the plan totaling ($2,283.76 × 60) or $137,025.60 unless unsecured creditors would be paid in full in a lesser period of time. The Debtor's schedules reveal a total of only $29,017.17 in general unsecured debt, much less than the $137,025.60 calculation of disposable income that the Debtor would be required to submit over the life of a five year plan (Doc. 1, Schedule F). Therefore, the only chapter 13 plan this Debtor could propose that would overcome the Trustee's objection is one that would pay unsecured creditors in full-i.e. a 100% return on their claims—either in five years or a lesser period of time if the payments could be completed earlier. *See* 11 U.S.C. § 1325(b)(4)(B).

Because the Debtor's plan proposes to pay unsecured creditors only 10% on their claims, instead of the 100% return required by the court's calculation of disposable income paid over the applicable commitment period, the plan cannot be confirmed.

 The court recognizes that this Debtor may never be able to propose a confirmable plan with a 100% return to unsecured creditors. The reason is simple. The Debtor's schedules of income and expenses reveal that she may not have the actual income necessary to pay her unsecured creditors in full within five years. This is the unfortunate result of a congressionally-created system that uses rigid formulas to calculate a debtor's chapter 13

plan payments rather than considering a debtor's present financial reality and ability to pay. Nonetheless, as noted elsewhere in this decision and by other courts interpreting these provisions of BAPCPA, it is not this court's function to legislate, but to interpret and apply the law as written. *Hanks,* 362 B.R. at 502. Section 1325(b), as written, requires this court to deny confirmation of the Debtor's proposed plan.

### VI. *Conclusion*

For the reasons stated above, confirmation of the Debtor's proposed chapter 13 plan (Doc. 2) is denied because it fails to satisfy the requirements of 11 U.S.C. § 1325(b). The court will issue a separate order sustaining the Trustee's objection and denying confirmation.

**SO ORDERED.**