**In re Kyle S. KOGLER and Tina M. Kogler, Debtors.**

No. 06–12027–7.

United States Bankruptcy Court, W.D. Wisconsin.

March 30, 2007.

Joseph A. Skokan, Piletich & Skokan, P.A., Stillwater, MN, for Debtors.

Carole J. Ryczek, U.S. Trustee's Office, Madison, WI, for U.S. Trustee.

## ORDER

THOMAS S. UTSCHIG, Bankruptcy Judge.

There is an oft-quoted saying, ostensibly an ancient curse, which bestows upon the recipient the desire that they might "live in interesting times."[1] Certainly this notion fairly represents bankruptcy jurisprudence in the wake of the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, perhaps the most sweeping modification of American bankruptcy law since the enactment of the 1978 code. Legal changes tend to necessitate the reexamination of seemingly settled principles, and the BAPCPA is riddled with opportunities for such debate. One area of intense discussion surrounds the revised version of 11 U.S.C. § 707(b), which mandates the dismissal of chapter 7 bankruptcy cases upon a finding of "abuse." This case turns on the appropriate interpretation of a seemingly innocuous statutory phrase, the answer to which has divided the courts that have considered the question and means the difference between a chapter 7 discharge for these debtors and the likely dismissal of their case.[2]

The U.S. Trustee's motion to dismiss this case was heard on March 5, 2007. The essential facts are as follows. The debtors filed bankruptcy on August 28, 2006. The debtors' chapter 7 statement of intention indicated that they planned to surrender their home, on which their monthly mortgage payments totaled $1,657.00, and one of their two vehicles, a 2005 Ford F-150 for which the monthly payment is $387.83. Despite the fact that they intended to surrender the collateral, they used these figures as deductions from their current monthly income in the calculation of their Form B22A, the so-called "means test." The U.S. Trustee contends that these payments are not proper deductions, and that the debtors' case must be presumed to be an abusive filing under 11 U.S.C. § 707(b)(2).

Under the BAPCPA, 11 U.S.C. § 707(b) was modified to provide that there is a "presumption of abuse" if a debtor's current monthly income, as reduced by certain allowed deductions and multiplied by 60, is "not less than the lesser of (I) 25 percent of the debtor's unsecured claims in the case, or $6,000, whichever is greater, or (II) $10,000." According to their Form B22A, the debtors' current monthly income is $6,702, for an annualized CMI of $80,424. The median income for Wisconsin households of similar size is $76,470. As prepared by the debtors, their Form B22A indicates that the "presumption of abuse" specified by § 707(b)(2)(A)(i) does not arise because their deductions for monthly expenses, including the home mortgage and car payment for property they intend to surrender, leaves them with no monthly disposable income to fund pay-

[1] According to the online encyclopedia Wikipedia, "interesting" in this context is usually interpreted as "turbulent" or "dangerous." *See* Wikipedia, *May you live in interesting times,* http://en.wikipedia.org/wiki/May_you_live_in_interesting_times (last visited March 28, 2007). Efforts to verify the source of this "curse" as Chinese in origin have generally proved futile, though it has been attributed as such in a variety of publications. One of its first verified appearances was in a 1966 speech by Robert Kennedy in Cape Town, South Africa; it also appeared in a 1950 science fiction story called "U-Turn" by Duncan H. Munro. *Id.* While it serves as an appropriately ironic characterization of many situations, it does not appear that the phrase is truly Chinese, ancient, or necessarily even a curse.

[2] The debtors would have the option of converting the case to Chapter 13 in the event they were not eligible for Chapter 7 relief.

ments to unsecured creditors under a chapter 13 plan.

While there are several discrepancies between the debtors' Form B22A and what the U.S. Trustee's Office believes should have been utilized, the critical distinctions surround the surrendered items. The means test permits debtors to claim various local standards for a variety of expenses, such as housing and transportation, but also permits debtors to claim higher amounts for actual secured debts. The U.S. Trustee acknowledges that if the debtors are permitted to claim the secured payments for the residence and vehicle which they plan to surrender, they do not have sufficient disposable income for the presumption of abuse to arise. According to the U.S. Trustee, however, § 707(b)(2) does not permit debtors to claim the monthly payments associated with surrendered items as secured debt, and the debtors are therefore only entitled to claim the local standards for housing and transportation costs. Under this analysis, they have sufficient income to trigger the presumption of abuse and would have to demonstrate "special circumstances" in order to qualify for relief under chapter 7.

In calculating the means test eligibility, the crucial language is found in § 707(b)(2)(A)(iii), which allows a debtor to deduct from monthly income the "average monthly payments on account of secured debts." The statute further provides:

The debtor's average monthly payments on account of secured debts shall be calculated as the sum of—

(I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and
(II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts;

divided by 60.

The U.S. Trustee contends that if the debtors plan to surrender collateral, those debts no longer qualify as "amounts scheduled as contractually due to secured creditors." The debtors, on the other hand, argue that the provision permits the debtors to deduct any outstanding secured debt as of the petition date, regardless of their subsequent intention as to disposition of the collateral.

As the parties have noted in their briefs, there is an emerging split of authority on this topic. In *In re Skaggs*, 349 B.R. 594, 600 (Bankr.E.D.Mo.2006), the court indicated that the "primary intent" of Congress in the passage of the BAPCPA was "to ensure that those debtors who can pay their debts do so." The court declined to limit its focus to the phrase "contractually due" and instead construed § 707(b)(2)(A)(iii) as contemplating a forward-looking examination of only those debts which a debtor intends to pay. Likewise, in *In re Harris*, 353 B.R. 304 (Bankr.E.D.Okla.2006), the court rejected the idea that debtors could include a deduction for secured debt on items which they intended to surrender. Noting that debtors frequently surrender collateral for the "express purpose" of lowering their monthly living expenses, the court stated:

When a debtor surrenders collateral, the debtor is no longer required to make the scheduled installment payments. If there is a deficiency after application of the collateral proceeds to the indebtedness, an unsecured claim remains, but a secured debt no longer exists and no

payment is due except for an unsecured deficiency balance.

*Id.* at 309.

Other courts, however, have taken a contrary view. In *In re Hartwick,* 352 B.R. 867, 870 (Bankr.D.Minn.2006), the court held that a debtor was entitled to deduct her actual monthly mortgage debt on her Form B22A despite her statement of intention that she planned to abandon the property. According to the *Hartwick* court, it is unnecessary to characterize § 707(b) as a "gate-keeper to the sanctuary of Chapter 7." *Id.* at 869. Instead, the court found that Congress did not appear to have had either concepts of fairness or judicial discretion in mind when fashioning the means test. The court stated:

> The means test presents a backward looking litmus test performed using mathematical computations of arbitrary numbers, often having little to do with a particular debtor's actual circumstances and ability to pay a portion of debt. Congress has already determined the fairness of application of the means test, and a major objective of the legislation was to remove judicial discretion from the process.

*Id.* Similarly, the courts in *In re Sorrell,* 359 B.R. 167 (Bankr.S.D.Ohio 2007), *In re Nockerts,* 357 B.R. 497 (Bankr.E.D.Wis. 2006), and *In re Walker,* 2006 WL 1314125 (Bankr.N.D.Ga.2006), all concluded that debtors were entitled to deduct such payments despite the stated intention to surrender or abandon the collateral.

In *In re Randle,* 358 B.R. 360 (Bankr. N.D.Ill.2006), the court likewise rejected the trustee's position and stated that the "plain language" of the section directs that the debtor "shall" deduct the amounts scheduled as contractually due. As the court stated:

> [The statute] does not say that the debtor can deduct this amount only if she intends to keep the collateral post-peti-

tion. It does not say that the debtor can deduct this amount only if she intends to continue making the payments due post-petition. And it does not refer to the debtor's Statement of Intention with respect to the collateral. The provision requires the court to consider only the amounts due under the contract itself.

*Id.* at 363. In the recent case of *In re Mundy,* 363 B.R. 407 (Bankr.M.D.Pa. 2007), the court concluded that the phrase "refers to the payments due under the contract between the debtor and the secured creditor regardless of the debtor's intent with respect to retention of the collateral or reaffirmation of the debt."

Finally, in a blending of these two approaches, the court in the case of *In re Singletary,* 354 B.R. 455 (Bankr.S.D.Tex. 2006), found that while the debtors could deduct payments on surrendered collateral, the means test and its "presumption of abuse" could take into account post-petition changes in the debtors' circumstances. The court noted that the U.S. Trustee may file a motion to dismiss under § 707(b) for up to 40 days after the meeting of creditors. Consequently, "the Presumption of Abuse Motion may be based on a means test calculation that includes any changed circumstances in the Debtors' position between the filing of the petition and the filing of the motion to dismiss." *Id.* at 466. Under this approach, debtors may deduct payments on secured debt relating to assets which they intend to surrender in the future, but not payments on secured debt relating to assets already surrendered when the U.S. Trustee's motion to dismiss is filed. *Id.*

The Court's task is to determine the appropriate application of § 707(b)(2)(A)(iii)'s reference to payments "scheduled as contractually due to secured creditors." The Supreme Court has repeatedly stressed that the inquiry should begin, and in many instances end, with the

statutory language itself. As the Court stated in *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 112 S.Ct. 1146, 117 L.Ed.2d 391, 397–98 (1992):

> [C]anons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. [citation omitted]. When the words of a statute are unambiguous, then, this first canon is also the last: "judicial inquiry is complete." [citation omitted].

*See also United States v. Ron Pair Enters.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290, 299 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'"). The decisions which reject the notion that debtors can deduct expenses for "surrendered" collateral from their CMI for purposes of the means test appear to suggest that such a result is at odds with congressional intent. *See Skaggs*, 349 B.R. at 600 (to focus on the single term "contractually due" would miss the "actual meaning and the intent of § 707(b)(2)").

In this regard, it is true that a "primary intent" of Congress in the passage of the BAPCPA was to ensure that "those debtors who can pay their debts do so." *Id.*; *see also In re Hardacre*, 338 B.R. 718, 725 (Bankr.N.D.Tex.2006). However, the overarching purpose of the BAPCPA is perhaps less relevant to the present inquiry than the intent behind the modifications to § 707(b). The House Report on the BAPCPA indicates that the prior statutory standard of "substantial abuse" was "inherently vague, which has led to ... disparate interpretation and application by the bankruptcy bench." *See* H.R.Rep. No. 109–31, pt. 1, at 12 (2005). Quite simply, the means test was specifically designed to remove judicial discretion from the abuse determination; it was created to provide a mechanical rule and a precise set of calculations which, once performed, determine whether the "presumption of abuse" arises. *See Randle*, 358 B.R. at 361 ("Congress' intent to utilize a standardized or mechanical test and avoid reliance on individualized information as much as possible is demonstrated throughout § 707(b)(2).").

The Court recognizes that post-petition circumstances might often indicate that a debtor is capable of making payments to creditors. Unfortunately, § 707(b)(2) simply does not afford a mechanism for the Court to adequately explore these circumstances, and the U.S. Trustee's proposed interpretation of what debts are "scheduled as contractually due" does little to address these issues. In fact, the U.S. Trustee's interpretation of the statute could easily lead to disparate effects on debtors with similar annualized incomes who make different statements of intention as they enter bankruptcy. Those who file bankruptcy and plan to surrender assets might be forced into chapter 13, while those who claim an intent to reaffirm debt only to subsequently surrender the collateral would be granted a chapter 7 discharge.[3] In *Hartwick*, the court noted the

---

3. As the debtors argued in their briefs, this raises an issue regarding the "policing" of debtors' post-petition finances. While the *Singletary* court noted that the U.S. Trustee could file a motion to dismiss under § 707(b) for at least 40 days after the meeting of creditors, § 707(b)(2) focuses on the 60–month period after the petition date. There is simply no statutory mechanism for judicial review of the debtors' actual expenses over the 60 months after the petition date; the code instead mandates that the court simply examine

difficulty inherent in attempting to divine the principles of equity or fairness associated with the "gate-keeping" interpretation of § 707(b)(2):

> A debtor with a $7000.00 monthly mortgage payment and $2,000.00 in combined vehicle payments on a Hummer and Lexus escapes the presumption of abuse. Another debtor in the same locale with a mortgage payment $392.00 per month more than the Local Standard monthly housing allowed amount of $1,033.00, who plans to give up the home post-petition, and who owns a modest older vehicle debt free, should be denied the actual housing cost at filing deduction and the car ownership expense [of] $427.00, suffering the presumption of abuse? How does the first example serve the gate-keeping purpose of keeping debtors who can afford to pay a portion of their debts out of Chapter 7? How does the second example? Not so apparent. What to do? Nothing. Application of the means test is not left by the BAPCPA legislation to judicial discretion.

352 B.R. at 870.

Whatever the broad legislative agenda behind the BAPCPA, the goal in revising § 707(b) to incorporate the means test was to create a rigid formula by which all debtors are to be judged, regardless of circumstance. Considering the debtor's post-petition intentions, hopes, or dreams seems to defeat this purpose; it smacks of judicial intervention in the mechanical computations dictated by the code. It creates an arbitrary distinction between debtors based not upon actual events but rather upon what they *say* they plan to do when they file bankruptcy. Arguably, the U.S. Trustee's interpretation of the code essentially punishes debtors for their honesty, as debtors who *say* they plan to reaffirm secured debts but do not do so would seemingly still "pass" the test.[4]

The statute is not ambiguous. To stretch the language to require a reference to the debtors' statement of intention is a "grammatical exercise too complex and strenuous to be considered 'plain'." *Mundy*, 363 B.R. at 412. It is most logically interpreted as a reference to the secured debts the debtors owe as of the date of bankruptcy, and the statute makes no provision for variance based on actual circumstance.[5] While permitting the debtors to deduct expenses for surrendered assets appears inconsistent with their actual ability to repay creditors, such a result is certainly not inconsistent with the congressional purpose of creating a mechanical test by which all debtors are judged as of

---

the secured debts *scheduled as contractually due* during that period of time.

**4.** Further, creditors are not required to agree to reaffirmation; a debtor can honestly state an *intention* to reaffirm only to find that a creditor wishes the collateral surrendered instead. To say that debtors should be judged solely on the content of their statement of intention underscores the disparity in treatment inherent in the U.S. Trustee's position. To say that the Court should delve into the actual circumstances behind a debtor's stated intention is to invite judicial review on a case-by-case basis. Each step along this path creates greater variance from the mathematical computations contemplated by Congress.

**5.** As noted by law professors Marianne Culhane and Michaela White:

> Section 707(b), former home of "substantial abuse," used to be three sentences long. The revised version now covers five single-spaced pages in the black-lined version of the Code, with seven subsections.

Mariane B. Culhane and Michaela M. White, "Catching Can–Pay Debtors: Is the Means Test the Only Way?" 13 Am. Bankr.Inst. L.Rev. 665, 668 (2005). Given the level of detail now in the statute, it seems only appropriate to recognize that Congress envisioned a rigid test applicable to all debtors rather than a standard tailored to the facts and circumstances of each case. *See In re Barr*, 341 B.R. 181, 185 (Bankr.M.D.N.C.2006).

the date they file for bankruptcy. Far from being in obvious conflict with the legislative intent, this understanding of the statute is completely consistent with the purpose of the means test itself. In fact, it would appear that it is the U.S. Trustee, not the debtors, who seeks to interpret the statute in a manner at odds with legislative intent. *See Randle*, 358 B.R. at 364 ("[T]he Trustee's interpretation of § 707(b)(2)(A)(iii) is completely contrary to Congress' intent because it requires the kind of case-by-case adjustment based on a debtor's individual circumstances for the presumption of abuse that Congress rejected.").

The best interpretation of § 707(b)(2) is to regard it as requiring a "snapshot" of the debtors' finances at the time of filing. In the end, it is essentially an eligibility test, a mechanical construct designed to restrict judicial review of the debtors' financial picture when arriving at a "presumption" of abuse. It does not contain any provision which permits a court to review the debtors' actual finances or to discount their secured debt.[6] It does not direct the court to consider only those secured debts which the debtors have reaffirmed (or hope to reaffirm), nor does it link the debtors' ability to claim a deduction for secured debt to the date on which the U.S. Trustee's office files a motion to dismiss.

Instead, it simply mandates that the debtors are to be permitted deductions for their secured debts which are "scheduled as contractually due" over the next 60 months. At the time of their filing, the debtors in this case were clearly contractually obligated to pay their mortgage debt and their vehicle loan. Those debts were

scheduled and were contractually due. As such, these monthly payments were appropriately deducted from the debtors' current monthly income on their Form B22A.

Accordingly,

IT IS ORDERED that the motion by the U.S. Trustee to dismiss this case is denied.

---

**6.** Despite this fact, even debtors who survive the means test calculation remain subject to judicial review under § 707(b)(3), which directs the court to examine the "totality of the circumstances" surrounding the debtors' financial condition when considering whether a filing constitutes an "abuse" of the system. The U.S. Trustee does not seek dismissal of this case under that standard.