In re Robert E. ANDERSON Jennifer
M. Anderson, Debtors.

No. 07–33937.

United States Bankruptcy Court,
S.D. Ohio,
Western Division at Dayton.

March 21, 2008.

Scott A. Kramer, Dayton, OH, for Debtors.

Christopher Kennedy, Cleveland, OH, for eCast Settlement Corporation.

Jeffrey M. Kellner, Chapter 13 Trustee; Scott G. Stout, Dayton, OH, Staff Attorney for Chapter 13 Office.

MaryAnne Wilsbacher, Office of United States Trustee, Columbus, OH.

### Decision Sustaining in Part, and Overruling in Part, the Objection of eCast Settlement Corporation to the Debtors' Chapter 13 Plan

GUY R. HUMPHREY, Bankruptcy Judge.

This contested matter is before the court on creditor eCast Settlement Corporation's ("eCast") objection to the confirmation of the Debtors' Chapter 13 plan. eCast's objection concerns various aspects of the Debtors' proposed Chapter 13 plan (Doc. 7), as amended (Doc. 22) (collectively as amended the "Plan"), all of which affect how much nonpriority unsecured creditors, such as eCast, should be paid under the Plan. This court has jurisdiction pursuant to 28 U.S.C. § 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), which concerns "confirmations of plans."

### I. *Procedural Background*

On September 7, 2007, the Debtors, Robert and Jennifer Anderson filed, among other documents, a Chapter 13 petition and their Official Form B22C (Doc. 1), *Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income.*

The Debtors' Plan, as originally filed, proposed to pay $1,466.00 each month for thirty-six (36) months and provided for a 25 % dividend for nonpriority unsecured creditors (Doc. 7). In addition, a consensual amendment to the Plan between the Chapter 13 Trustee and the Debtors includes the nonexempt portion of the Debtors' tax refunds for the years 2007, 2008 and 2009 (Doc. 22) as additional payments to the Chapter 13 Trustee to be distributed to creditors under the Plan.[1] On November 2, 2007, eCast, the largest unsecured creditor in this case[2], objected to the Plan (Doc. 29). The Debtors filed a response to the objection on December 10, 2007 (Doc. 41). On December 14, 2007, consistent with the court's ruling at the confirmation hearing on December 11, 2007, the court issued an order (Doc. 43) to allow the parties an opportunity to more fully brief the issues in dispute. On January 14, 2008, the Debtors filed an amended response to eCast's objection (Doc. 46) and an amended Official Form B22C (Doc. 45).

### II. *Issues*

The ultimate issue before the court is whether the Debtors' Plan should be confirmed. Bankruptcy Code § 1325(a)(1) provides that "[e]xcept as provided in subsection (b), the court shall confirm a plan if ... the plan complies with the provisions of this Chapter and with the other applicable provisions of this title[.]". Specifically, the issues are: 1) the meaning of "projected disposable income" under 11 U.S.C. § 1325(b)(1)(B)[3] for above median family

---

**1.** The Debtors indicated that, based upon their average tax refund in the four years prior to the filing of this case, the additional payments would raise the dividend to approximately 32% (Doc. 46). eCast refers to a 26% dividend in its reply brief (Doc. 47, p. 1). This discrepancy, as explained in this Decision, is not outcome determinative.

**2.** eCast was assigned the nonpriority unsecured claims of various creditors in this Chapter 13 case. See Proofs of Claim 14–1, 15–1, 16–1 and 17–1.

**3.** 11 U.S.C. § 1325(b)(1)(B) states that "[i]f the Trustee or the holder of an allowed unsecured claim objects to the confirmation of the

income debtors [4], and specifically, whether "current monthly income" ("CMI") can or should be adjusted based upon the Debtors' income at the time of the confirmation hearing; 2) how disposable income is to be calculated in this case, including: a) whether § 707(b)(2)(A)(iii) [5] allows secured debt to be deducted as an expense when the secured collateral is to be surrendered; and b) the allowable deduction for the IRS Local Standard transportation ownership/lease expense as allowed by 11 U.S.C. § 707(b)(2)(A)(ii)(I) [6] and its relationship to the secured debt expense for such vehicles as allowed by 11 U.S.C. § 707(b)(2)(A)(iii); and 3) what is the "applicable commitment period" as defined in 11 U.S.C. § 1325(b)(4) [7] and applied under § 1325(b)(1)(B) for the Plan.

### III. *Positions of the Parties*

The Debtors filed a Chapter 13 petition (Doc. 1) and Plan (Doc. 7) on September 7, 2007. The Debtors are above median family income debtors (Doc. 7). As noted, the Debtors propose to contribute a total of $1,466 each month, for thirty-six (36) months, and pay a 25 % dividend to nonpriority unsecured creditors (Doc. 7) and amended the Plan to contribute nonexempt post-petition tax refunds as additional plan payments (Doc. 22). The Plan provides

plan, then the court may not approve the plan unless, as of the effective date of the plan—
. . .
(B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to the unsecured creditors under the plan."

4. The Debtors are "above median family income" because, based on their household size of five, their income is more than the median income for such a household in Ohio. See 11 U.S.C. § 101(39A) (defining "median family income").

5. 11 U.S.C. § 707(b)(2)(A)(iii) states that:
"(iii) The debtor's average monthly payments on account of secured debts shall be calculated as the sum of—
(I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and
(II) any additional payments to secured creditors necessary for the debtor, in filing a plan under Chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts;
divided by 60."

6. 11 U.S.C. § 707(b)(2)(A)(ii)(I) states, in relevant part, that " [t]he debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the . . . Local Standards . . . issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order of relief. . . . "

7. 11 U.S.C. § 1325(b)(4) states that:
"(4) For purposes of this subsection, the 'applicable commitment period'—
(A) subject to subparagraph (B), shall be—
(i) 3 years; or
(ii) not less than 5 years, if the current monthly income of the debtor and the debtor's spouse combined, when multiplied by 12, is not less than—
(I) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;
(II) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or
(III) in the case of a debtor in a household exceeding 4 individuals, the highest median family income of the applicable State for a family of 4 or fewer individuals, plus $575 per month for each individual in excess of 4; and
(B) may be less than 3 or 5 years, whichever is applicable under subparagraph (A), but only if the plan provides for payment in full of all allowed unsecured claims over a shorter period."

for the Debtors to pay $335.77 each month to GMAC on a lease on a 2005 Chevrolet Trailblazer, until the lease ends in June 2008. In addition, the Debtors are surrendering a 2004 Harley Davidson and a 2000 Sportsman Travel Trailer to the secured creditors which hold liens on those assets, with those creditors being given an opportunity to file nonpriority unsecured deficiency claims.

■ The Debtors completed the required Official Form B22C (Doc. 1) and later amended the Form (Doc. 45). Although much of the Form is not in issue, certain line items of the Form are central to some of the disputes between the parties. The disputes between the parties in this case revolve around application of changes made to Chapter 13 of the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") and how those changes are embodied in Official Form B22C.[8]

CMI is defined by 11 U.S.C. § 101(10A)[9] and in this case is $7,453.99 (Doc. 45, line 14). The use of this figure to compute projected disposable income is disputed by eCast. eCast argues that the Debtors' actual income at confirmation should be used in determining the Debtors' payments to nonpriority unsecured creditors.

Pursuant to calculations made under § 707(b)(2)(A)(iii)(I), the Debtors are deducting the sixty (60) month average payment on two secured debts: $215.68 on a 2004 Harley Davidson and $274.23 on a Sportsman Travel Trailer. The Debtors' Plan (Doc. 7) indicates these vehicles are to be surrendered. eCast argues that the Debtors cannot deduct secured debt if the underlying collateral is to be surrendered by the Debtors.

eCast also challenges the appropriateness of some of the Debtors' other expenses. Specifically, in the Debtors' original Form B22C, the Debtors deducted $471.00 as their IRS Local Standard ownership/lease expense (Doc. 1, p. 43, line 28) for the 2005 Chevrolet Trailblazer lease. Additionally, among other secured debt, the Debtors deducted $78.02 as the amortized monthly amount due on the same 2005 Chevrolet Trailblazer lease (total due on the lease, divided by 60). The Debtors

---

**8.** As the issue has been raised by eCast in its filings, the court notes that the Official Forms can never trump the language of Title 11. *In re Fox*, 370 B.R. 639, 645 (Bankr.D.N.J.2007).

**9.** 11 U.S.C. § 101(10A) defines current monthly income as

"(A) ... the average monthly income for all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6–month period ending on—

(i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or

(ii) the date of which current income is determined by the court for purposes of this title if the debtor does not file the schedule

of current income required by section 521(a)(1)(B)(ii); and

(B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but excludes benefits received under the Social Security Act, payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes, and payments to victims of international terrorism (as defined in section 2331 of title 18) or domestic terrorism (as defined in section 2331 of title 18) on account of their status as victims of such terrorism."

As the statute indicates, CMI is based on the Debtor's six month pre-petition income, includes contributions of others to household expenses and has certain defined exclusions.

subsequently amended their Form B22C (Doc. 45) by modifying line 28. Following the instructions on Official Form B22C, the Debtors subtracted the $78.02 from the Local Standard ownership/lease expense and, therefore, the Debtors now deduct $392.98 as the Debtors' Local Standard ownership/lease expense for the Chevrolet Trailblazer. eCast argues that the Debtors are only allowed to take the secured debt expense on the Chevrolet Trailblazer lease because it is less than the Local Standard ownership/lease expense on the leased vehicle.

Finally, eCast argues that the Debtors' Plan is not confirmable because the Debtors have provided for payments over a thirty-six (36) month period and should have provided for payments over a sixty (60) month period. Thus, eCast argues that the "applicable commitment period" has a temporal aspect and in this case is sixty months.

## IV. *Analysis*

### A. The Debtors' CMI

Every Chapter 13 debtor must first calculate his or her disposable income to determine the amount which must be paid to nonpriority unsecured creditors. 11 U.S.C. § 1325(b)(2). Under BAPCPA, for above median family income debtors, disposable income is determined through a formula which, with certain exceptions not relevant here, starts with CMI and subtracts the statutorily defined expenses provided by § 707(b)(2). 11 U.S.C. § 1325(b)(2) and (3). In this instance, the Debtors' CMI is $7,453.99. See Doc. 45 (Amended Form B22C, line 11).

### B. "Projected disposable income" as defined by 11 U.S.C. § 1325(b)(1)(B) does not Provide for the Adjustment of CMI Based on Actual Income

Code § 1325(b)(1)(B) requires the debtor's projected disposable income to be paid to nonpriority unsecured creditors. The parties dispute the meaning of the term "projected disposable income" as used in § 1325(b)(1)(B). eCast notes that the Debtors' CMI is different than the Debtors' actual income at the time of confirmation and, therefore, the Debtors should be required to use their actual income, rather than their CMI, as the starting point in determining the Debtors' projected disposable income.[10]

As eCast acknowledges, CMI is the income part of the calculation of a debtor's "disposable income" within § 1325(b)(2). However, eCast cites a series of decisions which find that, when calculating "projected disposable income" under § 1325(b)(1)(B) to determine a debtor's payments to nonpriority unsecured creditors, a debtor's CMI can be adjusted based on the debtor's future income, as determined at the time of the confirmation hearing, rather than being solely based on CMI. These decisions focus on the word "projected" in § 1325(b)(1)(B) as requiring a view into the future. CMI is based on a debtor's pre-petition income. 11 U.S.C. § 101(10A). In interpreting the word "projected", one reported decision, *In re Jass*, 340 B.R. 411, 415–16 (Bankr.D.Utah 2006) determined that the figure from Form B22C, which includes CMI, should apply unless "this number does not ade-

---

10. Interestingly, the Debtors' CMI of $7,453.99 is higher than the actual income figure, $7,263.71, that eCast argues should be used in this case. If the figure proposed by eCast was used, it would further reduce the Debtors' disposable income and projected disposable income. Cf. Doc. 45, line 11 (Amended Form B22C) and Doc. 1, p. 25 (Schedule I).

quately represent the Debtor's budget into the future."

Without repeating all the different arguments and analyses developed in the numerous reported decisions on this issue, the court adopts *In re Kolb,* 366 B.R. 802 (Bankr.S.D.Ohio 2007) regarding how one determines "projected disposable income." In so doing, this court finds that *Kolb* properly gives deference to the plain meaning and holistic interpretation of the overall changes to § 1325(b) made by BAPCPA. *Kolb* and a line *of* decisions on one side of the debate conclude that CMI is not a "guide" or "presumption", but instead represents Congress' determination concerning how income should be defined for all Chapter 13 debtors in cases governed by BAPCPA's changes to § 1325(b). *Id.* at 810, n. 12.

In adopting *Kolb,* the court notes that there is no statutory basis for using CMI as a mere guide or presumption in determining what is "projected disposable income." CMI will almost never coincide exactly with a debtor's actual income at confirmation. Therefore, even ignoring the lack of a reference to such a rebuttable presumption in the language of BAPCPA or its legislative history, it is difficult to understand what purpose CMI serves within Chapter 13 if the court can adjust it to actual income at confirmation.

In following the formulaic approach adopted in *Kolb* and other decisions which do not adjust CMI in accordance with the apparent "reality" of debtors' financial situations at the time of confirmation, the court recognizes that in some cases, such as in *Kolb* itself, debtors will be precluded from pursuing relief under Chapter 13, at least for a period of time, because their income at the time of confirmation will be significantly less than it was during the six months prior to the filing of the bankruptcy case. On the other hand, in other cases debtors' income may be significantly higher at the time of confirmation than it was during the six months prior to the filing of the case, leading to what may appear to be a "windfall" to those debtors. Nevertheless, as suggested in footnote 22 of this Decision, this court believes that in adopting the "means test" for determining disposable income, Congress, with some exceptions, generally intended to reduce judicial discretion in favor of a process more akin to an administrative worksheet screening, qualification, and determination process. Thus, this court does not believe it is appropriate to adjust CMI at the time of confirmation to reflect the Debtors' income at the time of the confirmation hearing or adjust it to predict what the Debtors' income might be during the duration of the Chapter 13 Plan.[11]

## C. Calculation of the Debtors' Disposable Income

■ CMI minus an above median family income debtor's statutorily defined expenses in § 707(b)(2)(A), with certain adjustments not relevant in this case[12], represents the debtor's disposable income. *Kolb,* 366 B.R. at 812–13. In this case, the parties disagree on the Debtors' calculation of three specific expenses deducted

---

11. Since this matter is before the court on confirmation of the Debtors' Plan and not on a proposed post-confirmation plan modification, the court is not determining through this decision whether a plan may be modified post-confirmation to adjust the income component of a debtor's plan in the event of a change in the debtor's income.

12. The court notes that this Decision does not address what role the "special circumstances" provision of 11 U.S.C. § 707(b)(2)(B) may have in confirming a Chapter 13 Plan and post-confirmation modifications.

from their CMI to arrive at their "disposable income": 1) whether pursuant to § 707(b)(2)(A)(iii)(I) the Debtors can deduct secured debt for collateral proposed to be surrendered by the Debtors under the Plan; 2) how much the Debtors can deduct for the lease expense on the 2005 Chevrolet Trailblazer, and specifically, whether the Debtors are limited to deducting the lesser of: a) the actual remaining lease obligation amortized over sixty (60) months; or b) the IRS Local Standard ownership/lease expense; and 3) whether the Debtors may deduct $200 as the Local Standard vehicle operating expense on a 2002 Buick Rendezvous.

### 1. Secured Debt Expense on Property to be Surrendered

The parties dispute whether, pursuant to § 707(b)(2)(A)(iii)(I), the Debtors can deduct secured debt for collateral proposed to be surrendered by the Debtors under the Plan. The Debtors are deducting the total balances due to those two secured creditors amortized over sixty (60) months: $215.68 on a 2004 Harley Davidson and $274.23 on a Sportsman Travel Trailer. The Debtors' Plan (Doc. 7) indicates these vehicles are to be surrendered.

This dispute focuses on the language of § 707(b)(2)(A)(iii)(I) and how that language squares with Congress' intent in adoption of BAPCPA and the means test adopted as part of BAPCPA. Code § 707(b)(2)(A)(iii)(I) provides as follows:

(iii) The debtor's average monthly payments on account of secured debts shall be calculated as the sum of—

(I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition

11 U.S.C. § 707(b)(2)(A)(iii)(I).

There are two main lines of cases regarding whether pursuant to § 707(b)(2)(A)(iii)(I) debtors can deduct secured debt for collateral proposed to be surrendered. The majority line of cases is exemplified by *In re Sorrell*, 359 B.R. 167, 183–87 (Bankr.S.D.Ohio 2007). *Sorrell* was a Chapter 7 case which addressed this issue in the context of determining how such debts should be treated under the "means test" for determining whether Chapter 7 cases should be dismissed or converted to Chapter 13. *Sorrell* concluded that under § 707(b)(2)(A)(iii)(I) secured debt expense can be deducted for vehicles being surrendered. *Id.* at 183–87. *Sorrell* relied upon the plain language of the statute in arriving at that conclusion. *Sorrell* and the other cases in the majority essentially take a snapshot of the debtor's schedules on the petition date and conclude that "scheduled as contractually due to secured creditors" unambiguously refers to secured debts that are contractually owed by the debtors to secured parties as of the petition date.[13]

The other line of cases on this issue is exemplified by *In re Burden*, 380 B.R. 194 (Bankr.W.D.Mo.2007). *Burden* summarized the minority position as follows:

[T]he term "scheduled" in § 707(b)(2)(A)(iii)(I) has a bankruptcy-specific meaning which refers to how the debt is listed in a debtor's schedules and

---

**13.** Other cases in the majority include: *In re Burmeister,* 378 B.R. 227 (Bankr.N.D.Ill. 2007); *In re Hayes,* 376 B.R. 55 (Bankr. D.Mass.2007); *In re Kelvie,* 372 B.R. 56 (Bankr.D.Idaho 2007); *In re Wilkins,* 370 B.R. 815 (Bankr.C.D.Cal.2007); *In re Kogler,* 368 B.R. 785 (Bankr.W.D.Wis.2007); *In re Longo,* 364 B.R. 161 (Bankr.D.Conn.2007); *In re Mundy,* 363 B.R. 407 (Bankr.M.D.Pa. 2007); *In re Hartwick,* 359 B.R. 16 (Bankr. D.N.H.2007); *In re Randle,* 358 B.R. 360 (Bankr.N.D.Ill.2006), *aff'd* 2007 WL 2668727 (N.D.Ill. July 20, 2007); *In re Nockerts,* 357 B.R. 497 (Bankr.E.D.Wis.2006).

statements. Thus, if the debtor has indicated an intent to surrender the debt on his Statement of Intention, then the debt is not "scheduled as contractually due," and the debtor cannot deduct the payment on that debt on the means test. The minority asserts that its approach better effectuates BAPCPA's goal of ensuring that those debtors who can pay their debts do so.

*Id.* at 200–01 (footnotes omitted). In *Burden,* the court found it appropriate to interpret "scheduled", as that term is used in § 707(b)(2)(A)(iii)(I), to include a debtor's Statement of Intention. *Id.* at 201.[14]

■ This court finds the holding of *Sorrell* and of the other cases in the majority on this issue to be more persuasive. Without repeating the principles of statutory construction exhaustively reviewed and applied in *Sorrell,* the court notes that the Bankruptcy Code and Bankruptcy Rules specifically differentiate between "schedules" and "statements"[15] and in referencing "scheduled" secured debt in § 707(b)(2)(A)(iii)(I) the most logical construction of that phrase is to construe it as meaning contractually incurred debt scheduled on "Schedule D—Creditors Holding Secured Claims," which would be debt that is owed by the debtor on the petition date that is secured by collateral. This court construes the term "contractu-

ally due" as modifying "secured debt" to differentiate between voluntarily secured debts such as mortgages and security agreements and involuntarily secured debts such as judgment liens and statutory liens. Since the "Statement of Intention" is a "statement" under the Code and Rules, as opposed to a "schedule", and the Code and Rules clearly differentiate between the two, the court believes that as a matter of statutory construction the Statement of Intention cannot be morphed into the "Schedules."

Of course, Chapter 13 debtors do not complete a Statement of Intention. Instead, a Chapter 13 debtor provides for its treatment of secured collateral in proposing a Chapter 13 plan. The court also recognizes that, unlike Chapter 7, the expenses of § 707(b)(2)(A) are used for a different purpose in Chapter 13, and the "snapshot" approach may not be appropriate for all statutorily defined § 707(b)(2)(A) expenses for above median family income debtors. However, in the case of the secured debt expense of § 707(b)(2)(A)(iii), the court finds no principled basis to interpret the statutory language differently for Chapter 13. First, a Chapter 13 plan is no more a bankruptcy schedule than a statement of intention is in a Chapter 7.[16] Second, the court finds no

---

**14.** Other cases in the minority include: *In re Ray,* 362 B.R. 680 (Bankr.D.S.C.2007); *In re Harris,* 353 B.R. 304 (Bankr.E.D.Okla.2006); *In re Skaggs,* 349 B.R. 594 (Bankr.E.D.Mo. 2006); *In re Spurgeon,* 378 B.R. 197 (Bankr. E.D.Tenn.2007); and *In re Love,* 350 B.R. 611 (Bankr.M.D.Ala.2006).

**15.** See 11 U.S.C. § 521(a)(1)(B) and (2), Bankruptcy Rule 1009(a) and (b), Official Forms 6(A)—6(J) and Official Form 8—Chapter 7 Individual Debtor' Statement of Intention.

**16.** Although *Sorrell* and other cases also rely on the term "scheduled as" in

§ 707(b)(2)(A)(iii)(I) as not referring to the bankruptcy schedules for further support, the court bases its decision on the alternative argument that "a statement of intention is not a [bankruptcy] schedule." *In re Sorrell,* 359 B.R. 167, 185 (Bankr.S.D.Ohio 2007), *citing In re Randle,* 358 B.R. 360, 365–66 (Bankr. N.D.Ill.2006). Similarly, a proposed Chapter 13 plan is not a bankruptcy schedule either. For this reason, the court respectfully disagrees with decisions which seek a different interpretation of § 707(b)(2)(A)(iii)(I) in Chapter 13. Cf. *In re Spurgeon,* 378 B.R. 197 (Bankr.E.D.Tenn.2007), in which the court, at least in part, appears to base its reasoning on the Debtor's contractual obligation being

basis to treat identical language differently in the context of Chapter 13. Simply, the intention to surrender, either in a proposed Chapter 13 plan or a Chapter 7 Statement of Intention, does not change that such debts are contractually due at filing.

■ Congress may have wanted certainty of result for above median family income Chapter 13 debtors by relying on the phrase "scheduled as contractually due." Regardless of congressional purpose, the result is not absurd, or even unique, as Congress chose this same approach for other § 707(b)(2)(A) expenses. Specifically, Congress created a multitude of expenses that are determined at the petition date which include, at the least, all the IRS National Standards, Local Standards and Other Necessary Expenses, which are based on those in effect as of "the date of the order of relief." 11 U.S.C. § 707(b)(2)(A)(ii)(I). The reality that the statutory language chosen in BAPCPA may have unintended consequences does not create an exception to the overriding rule of applying the plain meaning of the language chosen. *Union Bank v. Wolas*, 502 U.S. 151, 158, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991).

■ Pursuant to § 1325(b)(3), the expenses of § 707(b)(2) are used for above median family income Chapter 13 debtors. Accordingly, since the language of § 707(b)(2)(A)(iii)(I) is used to determine an above median family income debtor's secured debt expense in Chapter 13, the court holds that contractually incurred secured debt scheduled on Schedule D relat-

ing to collateral being surrendered under a Chapter 13 plan may be deducted under § 707(b)(2)(A)(iii)(I) in calculating disposable income.[17]

## 2. Calculation of the Local Standard Transportation Ownership/Lease Expense

■ The parties dispute how much the Debtors can deduct for the lease expense on the 2005 Chevrolet Trailblazer. The Debtors originally deducted the lease balance remaining on the vehicle at $78.02 on a monthly basis amortized over sixty months. 11 U.S.C. § 707(b)(2)(A)(iii)(I). In addition, the Debtors also deducted the vehicle ownership/lease Local Standard of $471. 11 U.S.C. § 707(b)(2)(A)(ii)(I). In amending Form B22C, the Debtors chose to, consistent with the procedure on Official Form B22C, subtract the $78.02 from the Local Standard vehicle ownership expense of $471, and arrived at a net Local Standard Transportation Ownership/Lease Expense of $392.98. The Local Standards, including the vehicle ownership/lease expense, is an allowable, statutorily defined expense issued by the Internal Revenue Service. 11 U.S.C. § 707(b)(2)(A)(ii)(I).

eCast argues that the Debtors must use the lesser of: a) the Local Standard Transportation Ownership/Lease expense under § 707(b)(2)(A)(ii)(I); or b) the Debtors' actual lease expense amortized over a sixty (60) month period under § 707(b)(2)(A)(iii)(I). eCast's position is not supported by the language of the statute. The statute provides separate deductions

modified by a confirmed Chapter 13 plan. *Id.* at 201–02.

**17.** eCast notes that the subject items being surrendered can be classified as "luxury goods" in that they do not appear to be necessary to the sustenance of the Debtors and their dependents (Doc. 47, p. 11, n. 1). The

court notes that there may be circumstances under which a debtor's inclusion of secured debt relating to collateral being surrendered, particularly relating to luxury goods rise to a level to raise "good faith" issues under § 1325(a)(3); however, eCast has not raised that issue.

for secured debt, the $78.02 figure, and the Local Standard vehicle ownership expense. eCast's position is grounded in commentary from the Internal Revenue Service, which describes the meaning of the Local Standards. Specifically, eCast points to the Internal Revenue Service Financial Analysis Handbook (the "Handbook") 5.15.1.7 for support. This part of the Handbook provides that "[t]axpayers will be allowed the local standard or the amount actually paid, whichever is less."

The court's concern with applying this language is the Bankruptcy Code, as amended by BAPCPA, does not incorporate this language and, in such context, the question is should bankruptcy courts, nevertheless, give deference to these IRS interpretations, which were developed for a different purpose.[18] Section 707(b)(2)(A)(ii)(I) states that "[t]he debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified in Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides...." This section simply speaks of the "expense amounts." As noted, the Handbook commentary requires that a debtor pay the

lesser of his actual expense or his actual lease expense. BAPCPA does not require a debtor to take the lesser of the two deductions; it simply provides separate deductions.[19]

Thus, in the context of a statute allowing the proper deduction for vehicle ownership, the question is whether this court should use the commentary in the Handbook as a definitive guide to the application of the Local Standards for purposes of Title 11. Even assuming this court could wade through the pool of federal administrative law to find legal support for such deference[20], the court has no authority to raise the Handbook above the language Congress chose in writing BAPCPA. The language of BAPCPA provides separate subsections in § 707(b)(2)(A) for secured debt and the Local Standards issued by the IRS rather than require that the Debtors choose the lesser figure.

eCast has argued that Congress incorporated the Handbook into the language of BAPCPA by referencing "applicable monthly expense amounts" of the IRS for the National Standards and Local Standards. 11 U.S.C. § 707(b)(2)(A)(ii)(I). These decisions argue the word "applicable" is intended to mean when the "expense amounts" of the IRS should be ap-

---

18. The IRS National Standards, Local Standards, Other Necessary Expenses and the commentary in the Handbook was developed by the IRS to negotiate Offers in Compromise with delinquent taxpayers. See generally Keith M. Lundin, *The IRS Sneezes and the Advisory Committee on Bankruptcy Rules Catches a Cold*, 2007 No. 11 Norton Bankr.L. Adviser 2 (Nov.2007).

19. The Debtors, consistent with Official Form B22C, have agreed to a netting process, through which the secured debt expense is subtracted from the Local Standard ownership expense. Thus, the Debtor is deducting the greater of his actual secured debt expense for his vehicle and the IRS vehicle ownership expense. This result is consistent with the

statutory language and avoids the result of the Debtors "double dipping" on the same expense. The Debtors' approach is the most consistent with a holistic reading of the statutory allowed expenses in § 707(b)(2)(A).

20. See generally Matthew Stephenson & Kristin Hickman, *The Administrative Law of Borrowed Regulations:Legal Questions Regarding Bankruptcy Law's Incorporation of IRS Standards*, 2008 No. 1 Norton Bankr.L. Adv. 1 (January 2008) (discussion of the application of the Handbook into a new purpose, BAPCPA, and the complicated question of the deference bankruptcy courts should give to the Handbook).

710

plied, based on the limitations in the Handbook.

However, the use of the word "applicable" can be better understood as a contrast with the use of the word "actual" when referencing the Other Necessary Expenses. The Other Necessary Expenses cannot denotatively be the "applicable expense amounts", because there is no figure to "apply" as an expense. The IRS simply gives a list of these possible Other Necessary Expense categories and provides no "applicable expense amounts." The only figure a debtor possibly could provide for an "Other Necessary Expense" is his actual expense. *In re Weiderhold,* 381 B.R. 626, 630 (Bankr.M.D.Pa.2008). By contrast, for the Local Standards and National Standards, the proper amount "applicable" for a National or Local Standard is always a specific number and not a debtor's actual expense.[21] *Id.*

This reading is also more consistent with the remainder of § 707(b)(2)(A) which separately allows for secured debt expenses and the IRS Local Standards. These two sub-sections of § 707(b)(2)(A) do not reference each other in any manner which suggests the limitation eCast posits.

eCast also argues that the reasonably necessary standard should still apply for expenses for above median family income debtors. The court finds it clear that Congress rejected the more amorphous "reasonably necessary" standard for above median family income debtors. 11 U.S.C. § 1325(b)(3). The court finds no absurdity here[22], and, absent the unusual circumstance of absurdity or a clear scrivener error, the court will apply the statute as it was written, not as it could have been written.

Assuming there is sufficient ambiguity to consider legislative history, we find not answers, but instead the same questions in a much less persuasive form than the language of BAPCPA itself. The prefatory problem is the often cited legislative history of BAPCPA, the House of Representatives Judiciary Committee Report (the "Report"), is fraught with limitations. *Sorrell* noted that: "Even assuming it is appropriate to consider the House Judiciary Report (which represents only a view of members of one committee of one house of the federal bicameral legislature) as a source of legislative history, it often contains a mere recitation of the eventually enacted statutory text and adds little, if any, assistance to the court's efforts in determining Congress's intent." *Sorrell,* 359 B.R. at 176.

**21.** The vehicle ownership Local Standard is a single figure for all above median family income debtors throughout the United States. Certain National and Local Standards vary based on area of the country and household size.

**22.** It is more than possible that Congress simply wanted to limit judicial discretion, and limit individual adjustments to the disposable income formula based on particular fact patterns or simply failed to fully anticipate the consequences of its actions. See *In re Echeman,* 378 B.R. 177, 182, n. 6 (Bankr.S.D.Ohio 2007) ("The Supreme Court, in bankruptcy cases, has reminded the lower federal courts that absurdity does not equate to a poorly written statute, unintended consequences, or even subjectively poor policy choices."). Although it is seductively simple to declare such assumed missteps as "absurd" to avoid the plain meaning of the language Congress chose, absurdity is a very narrow exception and, although the tortured statutory scheme of BAPCPA probably requires its application in some situations, the court declines to apply it here. See *id* at 181–82, n. 6 (After noting the absurdity doctrine is "very limited", the court found, to the extent it relied on it in reaching its determination, it was invoked because the court could not "discern any theoretically plausible purpose for the result advocated by the Debtors.").

Additionally, this court notes that cases have noted that Congress refers to the Handbook in the Report. However, the Report, like BAPCPA, simply discusses the "amounts" in the Local and National Standards. See H.R. Rep. 109–31(I) (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 99–100 which states that: "In addition to other specified expenses, the debtor's monthly expenses ... must be the applicable monthly amounts set forth in [the Handbook] as Necessary Expenses under the National and Local Standards categories and the debtor's actual monthly expenditures for items categorized as Other Necessary Expenses." (footnotes omitted). As noted by eCast, Footnote 65 of the Report discusses the Local Standards, but the court finds that it provides no principled basis to raise this commentary above the language of BAPCPA itself. *Id.* at 352.[23]

Based on the Debtors' amended Official Form B22C, the parties also dispute an additional $200 deduction on a 2002 Buick Rendezvous which raises the Debtors' Local Standard vehicle operating expense from $358 to $558. The court need not address this deduction. Allowing this $200 deduction, the Debtors' projected disposable income is $9,620.40 ($160.34 × 60). Assuming, for purposes of argument that it is not proper, the Debtors' disposable income with this $200 added would be $360.34 on a monthly basis and their projected disposable income for sixty (60)

months would be $21,620.40. Without considering the tax refunds that the Debtors have agreed to contribute to Plan obligations, using the figure computed by eCast (Doc. 29, p. 3), the Debtors are paying $41,977.07 (after payment of Chapter 13 fees, attorney fees, secured debt and lease expenses) to nonpriority unsecured creditors, which is more than what they would be required to pay under the projected disposable income test of § 1325(b)(1)(B). Accordingly, even if the disputed $200 operating expense is eliminated from the Debtors' Form B22C, those creditors will not receive more than what they already are to receive under the Plan.

**D. The Meaning of the Term "applicable commitment period" as defined by 11 U.S.C. § 1325(b)(4) and applied within 11 U.S.C. § 1325(b)(1)(B) Includes Both a Multiplier and a Temporal Aspect**

Once disposable income for an above median family income debtor is defined, that figure is multiplied by the amount of months of the debtors' applicable commitment period to arrive at the total amount of "projected disposable income" that is to be paid over the duration of the plan period. Since the Debtors are defined as above median family income debtors, the "applicable commitment period" is five years, or sixty (60) months. 11 U.S.C. § 1325(b)(4). Accordingly, the Debtors' disposable income, multiplied by

---

**23.** Footnote 65 of the Report states that " 'Local Standards,' under the Internal Revenue Manual, establish expense standards for housing (*e.g., mortgage or rent, property taxes,* interest, parking, necessary maintenance and repair, homeowner's or renter's insurance, and homeowner dues and condominium fees) and transportation expenditures (e.g., vehicle insurance, vehicle payment, maintenance, *fuel, state and local registration,* parking fees, tolls, driver's license fees, and public transportation). Utilities (e.g., gas, electricity, wa-

ter, fuel, oil, bottled gas, wood and other fuels, trash and garbage collection, septic cleaning, and telephone) are included under the housing expense category. Housing standards are established for each county within a state. Transportation standards are determined on a regional basis...." H.R. Rep. 109–31 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 100, n. 65 (2005). The text where the footnote is found is similarly unhelpful. *Id.* at 100.

60, represents the total amount of funds required to be paid to nonpriority unsecured creditors. *Kolb,* 366 B.R. at 820. Thus, the "applicable commitment period" serves as a multiplier to convert "disposable income" to "projected disposable income." This determination is necessary because Congress has defined disposable income in § 1325(b)(2) in a formulaic manner and the court has no other method of "projecting" that fixed figure to arrive at projected disposable income under § 1325(b)(1)(B). As Judge Lundin noted in his treatise: "The complete disconnect between the actual provisions of the plan and the calculation of the applicable commitment period only makes sense if applicable commitment period is a number that is multiplied by disposable income to determine the entitlement to unsecured creditors." Keith M. Lundin, Chapter 13 Bankruptcy 3d ed., § 493.1, p. 493–9 (2000 & Supp.2006). See also *Coop v. Frederickson (In re Frederickson),* 375 B.R. 829, 833–34 (8th Cir. BAP 2007) (Section 1325(b)(1)(B) requires disposable income to be "projected", according to the statutory definition, "over the plan's term of years.").

 Another related issue is whether "applicable commitment period" serves to set the length of the plan or duration for which payments must be made to nonpriority unsecured creditors. The court agrees with *Kolb* that the plain language of § 1325(b)(4) ties the plan length to the "applicable commitment period" because § 1325(b)(4) speaks of "three years" or "five years," depending on whether the

Debtor is or is not an above median family income debtor. *Kolb,* 366 B.R. at 819. By its plain language, applicable commitment period has a temporal aspect. In this case, as the Debtors are above median family income debtors, the plan length for payments to nonpriority unsecured creditors must be five years and not the three years as proposed by the Debtors.[24]

 However, this may be a Pyrrhic victory for eCast in that the amount of funds to be distributed to nonpriority unsecured creditors remains unchanged once projected disposable income is determined. That is, based on the Plan, nonpriority unsecured creditors would simply receive the same dividend percentage over a longer length of time and, due to the time value of the funds, would, in reality, by receiving less. Thus, it would appear in the interest of all parties to simply allow the Debtors to pay their creditors the projected disposable income over a shorter length. As quoted in *Kolb,* "[A] few courts have suggested that it makes little sense for a trustee or unsecured creditor to object to confirmation in order to hold a debtor hostage for the full applicable commitment period; unsecured creditors will receive the same monetary return either way and most creditors would prefer to receive their return sooner rather than later." *Id.* at 819, n. 22. This court holds that a Chapter 13 plan that proposes to pay nonpriority unsecured creditors over a period of time that is less than the applicable commitment period is confirmable only in the absence of an objection by a creditor or party in interest.[25]

24. The Debtors argue plan length is set by U.S.C. § 1322. However, § 1322(d) provides only a maximum plan length for a Chapter 13 debtor's plan generally, rather than a minimum length for payments to nonpriority unsecured creditors, which is defined by § 1325(b)(4).

25. Since this matter is before the court on confirmation of the Debtors' Plan and not on a proposed postconfirmation plan modification, the court is not determining through this decision whether a plan may be modified post-confirmation to provide for payment of the projected disposable income over a period

In conclusion, "applicable commitment period" acts as both a multiplier to calculate the total amount of "projected disposable income" and also as the required length of a debtor's plan for the payment of nonpriority unsecured creditors.

### E. The Plan Satisfies the Projected Disposable Income Requirement of § 1325(b)(1)(B) Because It Pays Nonpriority Unsecured Creditors More than the Debtors' Projected Disposable Income

The Debtors propose to contribute to the Plan a total of $52,776 over the term of the Plan and, in addition, three years of future nonexempt tax refunds as additional plan payments. eCast's calculations suggest that after payments to the Chapter 13 Trustee for fees, payment of attorney fees, and payment of secured debt and lease expenses, the net amount to be paid to nonpriority unsecured creditors is $41,977.07. The Debtors' projected disposable income is only $9,620.40 with the $200 amount attributable to the 2002 Buick Rendezvous operating expense and $21,620.40 without that $200 expense. Thus, the amount the Debtors propose to pay under their Plan to nonpriority unsecured creditors exceeds their projected disposable income and, therefore, the Debtors meet the requirement of § 1325(b)(1)(B) that they pay all of their projected disposable income to their nonpriority unsecured creditors.

### V. *Conclusion*

The objection of eCast Settlement Corporation (Doc. 29) to the Debtors' Plan (Doc. 7), as amended (Doc. 22), is overruled in part, and sustained in part.

of time that is less than the applicable commitment period over the objection of an im-

eCast's objection is overruled and the Plan is confirmable, except that, absent eCast's consent to the Debtor's current plan payments to nonpriority unsecured creditors being paid over a thirty-six (36) month period, the Debtors must amend their Plan to provide for their payments being stretched out over a sixty (60) month period. As noted, based on the currently proposed Plan, the length of the Debtors' Plan shall not have any effect on the ultimate monetary distribution to nonpriority unsecured creditors.

eCast and the Debtors shall file an agreed order with respect to the limited issue of the Plan's length within 20 days after the entry of the order on this decision. If such an agreement cannot be reached, the Debtors shall file a modified plan within 30 days after entry of the order on this decision. The modified proposed plan may be consistent with the Debtors' currently proposed Plan, except to be confirmed by this court, it must change the applicable commitment period to sixty (60) months.